**Barbara SHUMAN et al., Plaintiffs,**

v.

**STANDARD OIL COMPANY OF CALIFORNIA, Defendant.**

**No. C–77–0270 SW.**

United States District Court, N. D. California.

June 27, 1978.

JoAnn L. Chandler, Nancy L. Davis, Mary C. Dunlap, Joan Messing Graff, Equal Rights Advocates, Inc., San Francisco, Cal., for plaintiffs.

Pillsbury, Madison & Sutro, W. R. Buxton, Terrence A. Callan, William S. Mailliard, Jr., Stephen P. Chambers, San Francisco, Cal., for defendant, Standard Oil Co. of California.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

Defendant Standard Oil Company of California (SOCAL) brings this motion for partial summary judgment in its favor dismissing with prejudice all of plaintiffs' claims for damages. After hearing on the matter and careful consideration of the briefs and

arguments of counsel the court denies defendant's motion.

## FACTUAL BACKGROUND

The undisputed facts before the court show plaintiff Barbara Shuman twice applied for a Chevron National Travel Card and was twice denied credit. At the time of her first application in November of 1975, Shuman listed income in excess of $1,000 per month and gave two credit card references (American Express and Shell Oil), as well as bank references for checking and savings accounts. She also indicated that she was 30 years of age and had no dependents. The application form contained blanks for spousal information, but did not indicate that the information was optional. It also offered the applicant a choice of titles for the addressing of correspondence (Mr., Mrs., Miss, Ms., other) without indicating the selection was non-mandatory. Her second application, made in January of 1977, again indicated income in excess of $1,000 per month, two credit card references (BankAmericard and Mastercharge) and checking and savings accounts.

All applications for Chevron National Travel Cards are initially evaluated by a computer that assigns weighted scores to the information provided by the applicant. Approximately 25% of all applications are automatically accepted or rejected on the basis of this initial scoring. Applications which the computer does not automatically accept or reject are scored "obtain a credit report." Once such a report has been obtained the application is either approved or disapproved based upon the information contained therein.

Shuman's first application was scored "obtain a credit report." SOCAL claims her application was denied because the credit report did not disclose that she had one year on the job and two credit items active in the file for one year. The credit report, however, did convey the information that her marital status was divorced or separated. It is not known at this time what weight was given to the information in her credit file. Her second application was automatically rejected by the computer because the weighted score was too low. Aside from these two unsuccessful attempts to obtain a Chevron National Travel Card, Shuman had never been denied credit.

This action was filed under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., [hereinafter cited as ECOA], alleging that Shuman and the class she claims to represent have been discriminated against by SOCAL on account of their sex and/or marital status. The complaint prays for undetermined actual damages and the statutory maximum punitive damages.

## EQUAL CREDIT OPPORTUNITY ACT

The Equal Credit Opportunity Act, 15 U.S.C. § 1691(a), provides in pertinent part that it, "shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of . . . sex or marital status." Section 1691e makes any creditor who violates the Act liable to the aggrieved applicant for any actual damages sustained by the applicant individually or as a member of a class. A more significant incentive for compliance, however, is found in § 1691e(b) which provides, "[a]ny creditor . . . who fails to comply with any requirement imposed under this subchapter shall[1] be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000 . . . except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $500,000 or 1 per centum of the net worth of the creditor." The statute directs the court in determining punitive damages to consider, among other relevant factors, "the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent

1. The court does not interpret the use of the word "shall" in this section to mean that punitive damages must be awarded for every viola-

tion of the ECOA without regard to the seriousness of the violation or the reason therefore.

to which the creditor's failure of compliance was intentional."

Although the Act has been in force since October of 1975 only one reported case has interpreted its provisions, *Carroll v. Exxon Company, USA*, 434 F.Supp. 557 (E.D.La. 1977), and that case does not address the problem of damages under the ECOA. In the absence of decisional law the court must look to the legislative history and analogous statutes to determine the nature and measure of actual damages flowing from a wrongful denial of credit and to determine what conduct by a defendant will trigger punitive damages.

### Actual Damages

SOCAL relies exclusively on statements made by Shuman in her deposition to establish that she suffered no actual damages. Noting Shuman admitted the motivation for her first application was convenience, the circumstances resulting in her second application were accidental, and she had no idea how her damages would be calculated, SOCAL concludes there is no record evidence to support a claim for damages, particularly where Shuman was perfectly free to buy Chevron products and services by paying cash.

Shuman admitted in her deposition that she and her former spouse, four to six years prior, had voluntarily terminated three other gasoline credit cards because she "didn't like the idea of not knowing at any particular moment exactly how much money [they] had." For a period of from four to six years following termination of these credit cards plaintiff never used credit for either automobile repairs and maintenance or gasoline purchases. Shuman also stated she applied for a Travel card in 1975 because she "felt it would be convenient to be able to use it on occasion" and that her reapplication in 1977 was "pretty much accidental." By these selected excerpts SOCAL attempts to demonstrate Shuman had no particular need or desire for a Travel card. However, Shuman also explained at her deposition she had applied for a Chevron card because she parked her car in a Chev-

ron garage and a credit card would have reduced the number of trips she needed to make to the bank for cash. Furthermore, because she had a Shell Oil Company credit card she purchased products from that company which she surmised might have been more expensive than or inferior to Chevron products which she did not buy because she did not have a Chevron credit card.

■ SOCAL's arguments properly go the amount of Shuman's damages, not their existence. As plaintiff observes, "[i]t is always true that if one has the cash, the products can be purchased, without credit. The denial which is actionable and for which damages are appropriate redress is the *denial of credit*, not the denial of products and services." Plaintiffs' Memorandum of Points & Authorities at 2. Credit has an independent worth in our economy. But, precisely because "[c]redit has ceased to be a luxury item," congress passed the ECOA to establish "as clear national policy that no credit applicant shall be denied the credit he or she needs and wants on the basis of characteristics that have nothing to do with his or her creditworthiness." 1976 U.S. Code Cong. & Admin. News at 405.

It takes little imagination to realize certain wrongful denials of credit will have far more onerous consequences than others, and, therefore, will generate far more substantial damages. In rudimentary terms, a home mortgage is more valuable than a gasoline credit card. However, the court is not prepared to rule the value of a gasoline credit card is de minimis as a matter of law. Convenience has some value as does increased purchasing power and protection for emergencies. Plaintiff has placed these losses in issue and is entitled to attempt to prove the amount of their worth at trial.

■ Shuman also argues she may recover compensation for embarrassment, humiliation and mental distress occasioned by the alleged wrongful denial of credit. Her argument likens the ECOA to Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3605, which proscribes discrimination on account of race, color, religion, sex or na-

tional origin in loans or other financial assistance for housing. Title VIII, like the ECOA, gives the aggrieved applicant a cause of action for actual and punitive damages, 42 U.S.C. § 3612(c), and it has been interpreted to provide compensation for embarrassment, humiliation and mental distress. *Smith v. Anchor Building Corp.*, 536 F.2d 231, 236 (8th Cir. 1976); *Williams v. Matthews Co.*, 499 F.2d 819, 829 (8th Cir. 1974), *cert. den.* 419 U.S. 1021, 1027, 95 S.Ct. 495, 42 L.Ed.2d 294; *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1121 (7th Cir. 1974); *Seaton v. Sky Realty Company, Inc.*, 491 F.2d 634, 636 (7th Cir. 1974); *Steele v. Title Realty Co.*, 478 F.2d 380, 384 (10th Cir. 1973).

The analogy to Title VIII is persuasive since both acts are statutory remedies for denial of civil rights. Furthermore, it would be inconsistent with the congressional purpose of eliminating invidious discrimination to ignore the emotional harm often flowing from it by limiting the aggrieved applicant to out-of-pocket losses. All the same, the court will not presume such damages have occurred. Neither the likelihood of such injuries nor the difficulty of proving them is so great as to justify deviation from the rule that compensation will not be provided where damage is not proven. *See, e. g., Carey v. Piphus*, 435 U.S. 247, 262, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Shuman has raised a genuine issue as to her emotional harm by deposition testimony that she was "infuriated," "angry," "upset" and "felt an injustice had been done" that needed to be rectified.

█ The final element of actual damage which Shuman claims derives from a wrongful denial of credit is harm to one's reputation for credit-worthiness. This kind of injury is, perhaps, the one most logically related to a denial of credit. However, as with the alleged emotional injuries, the court will not presume damages. Shuman must prove actual injury to her credit reputation before she may be compensated in damages.

Since Shuman has raised a genuine issue with regard to the harm she suffered from the alleged wrongful denial of credit, SOCAL's motion for summary judgment dismissing her claim for actual damages must be denied.

### Punitive Damages

Neither of the Travel card applications which Shuman submitted contained boxes for designation of sex or marital status. Affidavits submitted by SOCAL establish further that the computer is not programmed to identify and does not assign any score to sex or marital status. These undisputed facts, SOCAL asserts, affirmatively demonstrate that the company could not have acted in the malicious, wanton or oppressive manner necessary to trigger punitive damages.

Unfortunately, the language of the ECOA regarding punitive damages is somewhat ambiguous. While the traditional word "punitive" is used,[2] one of the factors listed for the court to consider in determining the amount of punitive damages is "the extent to which the creditor's failure of compliance was intentional." That language suggests punitive damages might be awarded even though the creditor's conduct was not wanton, malicious or oppressive.

---

**2.** Standard civil jury instructions advise the jury that punitive damages may be awarded if damage to the plaintiff was maliciously, or wantonly, or oppressively done, and define the key words as follows:

An act or a failure to act is "maliciously" done, if prompted or accompanied by ill will, or spite, or grudge, either toward the injured person individually, or toward all persons in one or more groups or categories of which the injured person is a member.

An act or a failure to act is "wantonly" done, if done in reckless or callous disregard of, or indifference to, the rights of one or more persons, including the injured person.

An act or a failure to act is "oppressively" done, if done in a way or manner which injures, or damages, or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of another person. Devitt & Blackmar, Federal Jury Practice and Instructions § 85.11 (3rd Ed. 1977).

At the time the ECOA was amended in 1976 and the limit on punitive damages was raised to its present level, the House version of the bill proposed to limit punitive damages to "willful" violations of the Act or its regulations. H.R. No. 210, 94th Cong., 1st Sess. 9 (1975). The House-Senate Conference Committee ultimately chose to retain the original language and omitted any reference to willfulness in the final version. The explanation for this omission, however, may be found in the separate comments of Congresswoman Leonor K. Sullivan, appended to the House Committee report on the proposed House amendments. Congresswoman Sullivan suggested the "willfully" language should be omitted since it connoted a standard used in criminal rather than civil statutes.

> Removal of the word "willfully" from H.R. 6516 would not open the way to frivolous law suits based on technical violations because other provisions of the legislation require that in successful class actions the court in determining the amount of the award must take into consideration, among other things, "the extent to which the creditor's failure of compliance was intentional." This is, in any event, a test which the courts would apply in any case involving punitive damages. Requiring that *willfulness* be proved as a condition of collecting punitive damages would mean that the kind of proof generally required in criminal cases would have to be produced in civil actions under this law. H.R. No. 210, 94th Cong., 1st Sess. 18 (1975).

This limited legislative history does not explain whether congress intended to eliminate the traditional threshold requirement that the defendant acted maliciously, wantonly or oppressively. The parties agree that the creditor's violation must have been intentional in the sense that the creditor purposefully denied credit. However, they disagree as to whether it must be proven that the creditor acted with the specific purpose of denying credit on account of the applicant's sex or marital status.

The most sensible reading of the statute adopts something of a middle course. Since punitive damages are awarded to punish the defendant and to serve as an example or warning to others not to engage in the same conduct, they are only justified when the defendant has committed a particularly blameworthy act. Consistent with this principle, however, congress might have intended to punish creditors who acted in reckless disregard of the requirements of the law, even though they did not have in mind the specific purpose of discriminating on unlawful grounds. If this interpretation is adopted the language "the extent to which the creditor's failure of compliance was intentional" is read as a reference to the specific intent to discriminate on prohibited grounds. Designation of the damages as "punitive," on the other hand, implies a threshold requirement that the defendant has acted in reckless disregard of the requirements of the law.

As noted above, SOCAL maintains it is entitled to summary judgment dismissing plaintiffs' claims for punitive damages because the computer scoring system does not recognize or assign values to sex or marital status. However, the initial computer screening only accepts or rejects approximately 25% of the applicants. The remaining 75% are accepted or rejected on the basis of information contained in a credit report, presumably obtained from some credit reporting agency or bureau. SOCAL has *not* submitted an affidavit avowing that sex and/or marital status are never considered when the credit reports are evaluated, nor has it submitted an affidavit avowing that information regarding Shuman's pending divorce contained in her credit file did not form a basis for the first denial of her application for a Travel card.[3] For this reason, SOCAL's claim of innocence is incomplete.

Shuman asserts a different basis for denial of the motion. She claims that SOCAL's

---

**3.** This omission may be an oversight since defendant's Reply Memorandum urges that statements have been made in the affidavit of Jerry Pollack which the court cannot find therein. See Defendant's Reply Memorandum 10, 11.

willful discrimination may be inferred from deficiencies in its credit granting system. The computer scoring system is discriminatory, she argues, because major values in the system are assigned to characteristics (industry employing and type of employment) which have a significant correlation with sex. The computer scoring system is also defective, in her view, because the system for calculating the weights for each characteristic defines previously disapproved applicants as bad credit risks and, therefore, carries forward a subjective bias against women. Because the computer system demonstrates significant sophistication, Shuman concludes, SOCAL cannot be ignorant of the system's effect. Quite naturally, SOCAL disputes the validity of these assertions as well as the relevance of any inference that might be drawn from them.

The second aspect of the system which Shuman finds objectionable is the heavy reliance on credit reports. There is no information on the credit card application form to the effect that the applicant should list any other name under which the applicant's credit history might be found. The reliance on credit reports without such information, she insists, discriminates against married, separated and divorced women who have established credit histories in their husband's name. Finally, Shuman argues that SOCAL's disregard of the requirements of the ECOA is demonstrated by its use of application forms which did not conform to regulations issued to enforce the Act. Application form 1–75, which was used from January 1975 through March 23, 1977, violated the terms of 12 C.F.R. §§ 202.4(c) and 202.5(b) (1977), regulations which became effective on June 30, 1976, by requesting information concerning spouses, in non-community property states and by not designating the request for a title as optional. SOCAL deems these objections irrelevant because they do not demonstrate that the company considers sex or marital status when it grants or denies credit and without such a showing, in its view, punitive damages may not be awarded.

As is evident from the preceding discussion, resolution of the punitive damage issue necessarily implicates the merits of the entire controversy. Whether the defendant acted in reckless disregard of the requirements of the law cannot be determined when the issue of whether the defendant even violated the law is so hotly disputed. If the underlying statute were well defined by precedent a preliminary determination of the type SOCAL seeks might be realistic; but, where there are virtually no reported cases interpreting the ECOA such a determination is premature. SOCAL's motion also must be denied because the defendant's state of mind is relevant to the question of punitive damages and summary judgment is inappropriate where intent is a material issue. *See* 6 Moore's Federal Practice ¶ 56.17 [41.–1]. Since there are triable issues of fact regarding defendant's conduct and any state of mind that might be inferred therefrom plaintiffs are entitled to proceed to trial on their claim for punitive damages.

For the reasons given above and for good cause appearing IT IS HEREBY ORDERED that defendant's motion for partial summary judgment dismissing all of plaintiffs' claims for damages be, and it is, hereby denied.