[No. 3395–II.  Division Two.  May 23, 1980.]

SUZANNE McFADDEN, ET AL, *Appellants,* v. THE ELMA COUNTRY CLUB, ET AL, *Respondents.*

196

*Alan Rasmussen,* for appellants.

*Ted F. Zelasko,* for respondents.

PEARSON, A.C.J.—Suzanne McFadden and Patrick Sloan appeal from an order granting summary judgment to the

Elma Country Club. The only issue before this court is whether the respondent country club discriminated against McFadden on the basis of her sex or marital status in violation of RCW 49.60.222 when she was denied membership in the country club. After reviewing the history and purpose of RCW 49.60, we hold the trial court properly determined, as a matter of law, that there was no violation of RCW 49.60.222 by respondents.

McFadden and Sloan lived together in Tacoma for 2 years before July of 1977, when they signed an earnest money agreement to purchase the home of Dolores Sagen, located on Elma Country Club property. Sagen informed the Club's board of directors that she proposed to sell her share of stock, carrying with it the right to possession of a lot within the boundaries of the Club. The Board asked to meet with the purchaser pursuant to article 3 of their bylaws, providing:

> Each member of the Club shall hold at least one share of the stock of the Corporation and shall not sell, transfer or encumber the same without first submitting the name of the person who is purchasing, to the Directors for the purpose of having such person elected to membership in the Club. If the Board of Directors shall decide that such person is not satisfactory and shall fail to elect him to membership such sale or transfer shall not be made.

The Board was not informed that an earnest money agreement had already been signed, but they received a letter from Suzanne McFadden stating, "I am in the process of buying the Sagen house."[1] The letter also stated, "My fiance's mother has a cabin in the Lost Lake Country Club." On meeting with Ms. McFadden and Mr. Sloan, the Board learned that they were not actually engaged, but intended to live together year round on Club property. McFadden applied for Club membership in her own name; Sloan did not.

---

[1] According to the Club's procedure, transfer of the stock carried with it the right to possess the Club's residential property without any formal transfer of title.

The Board met on August 3, 1977, and the members present voted unanimously to deny McFadden's application on the basis of her "living arrangement." The president notified her by letter of August 5, 1977, explaining:

> The Board was satisfied that a majority of the members did not approve granting your application, and that to do so would not be consistent with the intent and purposes of our by–laws and articles of incorporation. This was not an easy decision for the Board to make—it's the first time this situation has come up.

McFadden's attorney wrote to the president on August 8, demanding reconsideration of McFadden's application. The president wrote back and reiterated the Board's decision, referring to the Club's bylaws

> which provide that no immoral practices shall be permitted on Club property; the Board is of the opinion that a majority of the members consider such a living arrangement is immoral, and not an example we want to set for our children and grandchildren, especially by approving same for a member.

No other applications for Club membership had been denied in the preceding 2 years. The only purpose of the Club is ownership and management of the real estate around Lost Lake on behalf of the shareholders.

McFadden and Sloan brought suit for an injunction to compel the country club's directors to grant McFadden membership in their corporation, and for money damages, on the basis that the Club's actions violated RCW 49.60-.222. That statute makes it an unfair practice for any person to refuse to engage in a real estate transaction with another because of sex or marital status.[2] The Club denied

---

[2] RCW 49.60.222 provides:

"Unfair practices with respect to real estate transactions, facilities, or services. It is an unfair practice for any person, whether acting for himself or another, because of sex, marital status, race, creed, color, national origin, the presence of any sensory, mental, or physical handicap, or the use of a trained dog guide by a blind or deaf person:

"(1) To refuse to engage in a real estate transaction with a person;

such discrimination, and cross motions for summary judgment were filed. There was no dispute as to the facts set forth above; the only issue between the parties was the applicability of RCW 49.60.222 to those facts. The trial court entered summary judgment for the Club and dismissed the complaint by McFadden and Sloan, resulting in their appeal to this court.

■ ■ Summary judgment should be granted only when no genuine issues of material fact are before the court in the record and the moving party is entitled to judgment as

---

"(2) To discriminate against a person in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith;

"(3) To refuse to receive or to fail to transmit a bona fide offer to engage in a real estate transaction from a person;

"(4) To refuse to negotiate for a real estate transaction with a person;

"(5) To represent to a person that real property is not available for inspection, sale, rental, or lease when in fact it is so available, or to fail to bring a property listing to his attention, or to refuse to permit him to inspect real property;

"(6) To print, circulate, post, or mail, or cause to be so published a statement, advertisement, or sign, or to use a form of application for a real estate transaction, or to make a record or inquiry in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a limitation, specification, or discrimination with respect thereto;

"(7) To offer, solicit, accept, use, or retain a listing of real property with the understanding that a person may be discriminated against in a real estate transaction or in the furnishing of facilities or services in connection therewith;

"(8) To expel a person from occupancy of real property;

"(9) To discriminate in the course of negotiating, executing, or financing a real estate transaction whether by mortgage, deed of trust, contract, or other instrument imposing a lien or other security in real property, or in negotiating or executing any item or service related thereto including issuance of title insurance, mortgage insurance, loan guarantee, or other aspect of the transaction. Nothing in this section shall limit the effect of RCW 49.60.176 relating to unfair practices in credit transactions; or

"(10) To attempt to do any of the unfair practices defined in this section.

"Notwithstanding any other provision of law, it shall not be an unfair practice or a denial of civil rights for any public or private educational institution to separate the sexes or give preference to or limit use of dormitories, residence halls, or other student housing to persons of one sex or to make distinctions on the basis of marital or family status.

"This section shall not be construed to require structural changes, modifications, or additions to make facilities accessible to a handicapped person except as otherwise required by law. Nothing in this section affects the rights and responsibilities of landlords and tenants pursuant to chapter 59.18 RCW."

a matter of law. *Adamski v. Tacoma Gen. Hosp.*, 20 Wn. App. 98, 579 P.2d 970 (1978). In the present case, the trial court preliminarily expressed recognition of a factual issue whether the country club was private, but granted summary judgment on the assumption that the laws against discrimination would apply whether or not it was private. RCW 49.60.040, which defines terms used in the law against discrimination, contains a definition for places of "public resort, accommodation, assemblage, or amusement" followed by a proviso:

> That nothing contained in this definition shall be construed to include or apply to any institute, bona fide club, or place of accommodation, which is by its nature distinctly private, including fraternal organizations, though where public use is permitted that use shall be covered by this chapter; . . .

Significantly, this proviso was amended in 1979 to contain the phrase "nothing contained *in this definition*" instead of the former phrase, "nothing contained*herein.*" (Italics ours.) While "herein" could arguably be construed as applying to the entire chapter, a legislative intent to limit the private club exception to places of public resort can be presumed from the 1979 limitation to "this definition." *See Strunk v. State Farm Mut. Auto. Ins. Co.*, 90 Wn.2d 210, 580 P.2d 622 (1978); *In re Jackson*, 89 Wn.2d 945, 578 P.2d 33 (1978). Express mention of one thing in a statute implies exclusion of another, and where a statute expressly designates the things to which it refers, there is an inference that all omissions were intended by the legislature. *State v. Seger*, 1 Wn. App. 516, 463 P.2d 185 (1969). Therefore a private club is exempt from the discrimination laws applicable to places of public resort, accommodation, assemblage or amusement, but not from the discrimination laws applicable to real estate transactions.[3] We hold the

---

[3]We do not believe the later amendment in 1979 suggests any basic change from the original legislative enactment of 1957, since that enactment clearly excluded private clubs from discrimination laws applicable to places of public accommodation.

trial court correctly determined that the country club's private character was not an outcome determinative issue under the present statute. *See Ohler v. Tacoma Gen. Hosp.,* 92 Wn.2d 507, 598 P.2d 1358 (1979).

The next issue is whether the country club and Suzanne McFadden were involved in a real estate transaction within the meaning of RCW 49.60.222. A grant of membership in the Elma Country Club carries with it the right to exclusive possession, use and occupancy of a Club-owned lot, and the sole purpose of the Club is the ownership and management of such lots. RCW 49.60.040 provides that a "'Real estate transaction' *includes* the sale, exchange, purchase, rental, or lease of real property." (Italics ours.) This definition is illustrative, but not exclusive. The Human Rights Commission, which was created by RCW 49.60.010 to carry out the purpose of the law against discrimination, stated in its Declaratory Ruling No. 9 on April 18, 1974:

> When R.C.W. 49.60.222 was originally proposed and enacted in 1969 it was intended to be comprehensive, that is, to cover every possible real property transaction without exception.

1 Wash. Human Rights Rep. IC–11 (1974).

Thus, while the transfer of country club property which follows the transfer of a membership share is not a conventional "sale or exchange," it is, we think, a real estate transaction within the broad meaning of that term in RCW 49.60.

Now we turn to the pivotal issue of whether the denial of McFadden's application for membership constituted discrimination on the basis of her marital status. RCW 49.60-.222 was originally limited to discrimination because of race, creed, color, or national origin. It was amended in 1973 to add discrimination because of sex or marital status to its coverage. At that time RCW 9.79.120 provided in pertinent part:

Every person who shall lewdly and viciously cohabit with another not the husband or wife of such person, . . . shall be guilty of a gross misdemeanor.

Such cohabitation was punishable by a jail term of up to 1 year or a fine of $1,000 or both.[4] RCW 9.79.120 remained in effect until 1976, 3 years after the amendment of RCW 49.60.222 to cover marital status discrimination. Statutes are to be construed in accordance with legislative intent, and courts are required to view statutes as if the legislature has considered its prior enactments. *State v. Pawling,* 23 Wn. App. 226, 597 P.2d 1367 (1979). The existence of the illegal cohabitation statute for 3 years after the amendment of RCW 49.60.222 would seem to vitiate any argument that the legislature intended "marital status" discrimination to include discrimination on the basis of a couple's unwed cohabitation.

Furthermore, in 1975 the legislature responded quickly to a Human Rights Commission ruling[5] that it was an unfair practice under RCW 49.60.222, as it was then worded, for a college to permit occupancy of its student housing units by married couples, but not unmarried couples. In response, the legislature promptly amended RCW 49.60.222, declaring it not be be an unfair practice or a denial of civil rights for such discrimination to occur in the colleges of this state. Plaintiffs contend that the fact that this amendment did not extend beyond the college setting shows a legislative intent to prohibit discrimination of this kind in other areas. We do not agree. While the amendment purports to address only the imminent college housing problem created by the Commission's ruling, we believe the declaration in the amendment expresses a broader public policy against protection of unmarried living arrangements.

We note there had been no judicial construction of RCW 49.60.222 relating to this subject at the time the Human

[4]RCW 9.92.020.

[5]Declaratory Ruling No. 9, dated April 18, 1974. 1 Wash. Human Rights Rep. IC–11 (1974).

Rights Commission made its ruling or at the time the legislature amended the provision in 1975. The court and not the Commission is the appropriate forum to determine the construction and interpretation of statutes; thus, even when the court's interpretation is contrary to that of the agency charged with administering the law, it is ultimately for the court to declare the law and effect of the statute. *Hearst Corp. v. Hoppe,* 90 Wn.2d 123, 580 P.2d 246 (1978).

In that connection, we note that the Commission's inclusion of "unmarried *couples* of the opposite sex" within the protection of RCW 49.60.222 is inconsistent with the statutory language, which repeatedly prohibits discrimination against "a person." (Italics ours.) We do not dispute that discrimination against a person on the basis of sex, marital status, race, creed, color, national origin, or a handicap could be practiced against more than one person in violation of the statute. This does not mean, however, that the Commission was correct when it purported to find discrimination against unmarried couples where there was no claim of discrimination against either person individually because of his or her marital status.

In any case, the legislature's narrow answer to a perceived threat of discrimination suits by unmarried couples seeking student housing left unanswered the question whether RCW 49.60.222 applies to unmarried couples seeking other kinds of housing. Washington case law does not address this question, although the meaning of "marital status" has been addressed in another context.

RCW 49.60.180(1) makes it an unfair practice for an employer to refuse to hire any person because of, among other things, such person's marital status, unless the refusal is based on a bona fide occupational qualification. In *Washington Water Power Co. v. State Human Rights Comm'n,* 91 Wn.2d 62, 586 P.2d 1149 (1978), citizens complained of employment discrimination on the basis of marital status because of an "anti–nepotism" practice, that is, the refusal to hire spouses of employees. It was held that the meaning of marital status as used in RCW 49.60.180(1)

is not limited to conditions such as being married, single or divorced, and that the statute applies to antinepotism policies based on the *identity* of an employee's or applicant's spouse as well. We think that the present case is distinguishable in that there was no discrimination against McFadden based on the identity of Sloan or on either party's individual marital status, but only on their joint living arrangement. We point out specifically that the discrimination complained of here was not directed against either McFadden or Sloan as individuals.

There is no federal statute specifically prohibiting private discrimination in real estate transactions, but the Equal Credit Opportunity Act, 15 U.S.C. § 1691 (Supp. 1979), provides in part that it shall be unlawful for any creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of marital status. Although the act has been in force since October of 1975, the only reported cases interpreting its provisions do not address the scope of the term "marital status." *See Shuman v. Standard Oil Co.*, 453 F. Supp. 1150 (N.D. Cal. 1978); *Smith v. Lakeside Foods, Inc.*, 449 F. Supp. 171 (N.D. Ill. 1978); *Carroll v. Exxon Co.*, 434 F. Supp. 557 (E.D. La. 1977). Distinctions based on marital status are not specifically alluded to in the 1964 Civil Rights Act, 42 U.S.C. § 2000 (1974). However, Title 7, which appears in 42 U.S.C. § 2000e–2 (1974), does prohibit sex discrimination by employers,[6] and federal court decisions indicate that an employer's use of distinctions based on marital status may constitute sex discrimination under Title 7. *See* 34 A.L.R.

---

[6]42 U.S.C. § 2000e–2 (1974) provides:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

Fed. 648, §§ 2, 5(a) (1977). Those decisions involve "sex-plus classification," such as employment policies requiring the resignation of all female employees who marry, while permitting male employees to marry and retain their positions. *See McArthur v. Southern Airways, Inc.*, 404 F. Supp. 508 (N.D. Ga. 1975);[7] *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 27 L. Ed. 2d 613, 91 S. Ct. 496 (1971). The federal decisions do not hold that there is discrimination on the basis of marital status where members of both sexes are subjected to the same employment policies. Also, we can perceive no public policy for protection of this type of living arrangement even though it appears to be more widely tolerated than in the past.

We hold, therefore, that in the absence of any authoritative decision to the contrary, in view of the legislative history of the statute, in the absence of any strong public policy to the contrary, marital status discrimination as used in RCW 49.60.222 does not include discrimination against couples who choose to live together without being married.

The trial court properly determined as a matter of law that the country club's actions did not constitute unlawful discrimination on the basis of marital status. Hence, we affirm the summary judgment.[8]

PETRIE and PETRICH, JJ., concur.

---

[7]*Dismissed on other grounds, McArthur v. Southern Airways, Inc.*, 569 F.2d 276 (5th Cir. 1978).

[8]L. Edward Brown abandoned his cross appeal.