[No. 47778–7.   En Banc.   January 14, 1982.]

SUSAN JO YAMAUCHI, *Petitioner,* v. THE
DEPARTMENT OF EMPLOYMENT SECURITY,
*Respondent.*

*Larry J. Butler,* for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *Matthew J. Coyle, Assistant,* for respondent.

UTTER, J.—The Department of Employment Security denied petitioner Susan Jo Yamauchi unemployment benefits pursuant to RCW 50.20.050. This judgment was reversed by the Superior Court, whose decision was in turn reversed by the Court of Appeals. We disagree with the Court of Appeals and reinstate the decision of the trial court awarding compensation to the petitioner.

Susan Jo Yamauchi was employed by the Franklin County PUD from June 1974 until April 21, 1978. At the time she left her job, she was a PBX (switchboard) operator and earned $990 per month.

Yamauchi left her job in Pasco on April 21 to be married on April 29 and join her fiance in Spokane. On Friday, April 28, she applied in Pasco for unemployment benefits and was told to apply at the Spokane Job Service Center. The marriage occurred on April 29, 1978, and she moved to Spokane on April 30. On May 3, Yamauchi applied for unemployment benefits at the Spokane Job Service Center. She received a waiting period credit for the week ending April 29, and received benefits of $119 per week for the weeks May 6 through May 20, 1978, at which time she received a determination notice denying further benefits. Yamauchi then instituted and completed unsuccessfully the administrative review procedure with respect to this notice. The ultimate "Decision of Commissioner" adopted the findings of fact and conclusions of law of the appeal tribunal, which found Yamauchi had left work voluntarily without good cause under RCW 50.20.050(1), and that she was

ineligible for treatment under the beneficial provisions of RCW 50.20.050(4) concerning persons "whose marital status or domestic responsibilities cause him or her to leave employment."

The Superior Court reversed the decision of the commissioner ruling that Yamauchi satisfied the conditions of RCW 50.20.050(4) as to "marital status or domestic responsibilities" and was eligible for unemployment benefits if that provision's 10–week disqualification period had passed and she had fulfilled that provision's reporting requirements. The Court of Appeals in turn reversed the decision of the Superior Court, holding that Yamauchi's employment termination did not fall within the categories of "marital status or domestic responsibilities" as promulgated in RCW 50.20.050(4). We granted Yamauchi's petition for discretionary review.

The only issue before us is whether the terms of RCW 50.20.050(4) concerning persons "whose marital status or domestic responsibilities cause him or her to leave employment" apply to petitioner Yamauchi's termination of employment to be married and move from Pasco to Spokane.

█ Respondent department first contends the "marital status" provision of RCW 50.20.050(4) is limited to those who are married and that the plain meaning of the phrase connotes the status of being married. Yamauchi argues persuasively that the plain meaning of the phrase refers to one's relationship with respect to marriage (*e.g.,* married, single, divorced). Persons often assume that questions about their marital status are to this broader reference. Yamauchi's plain meaning argument is further bolstered by Washington's laws against discrimination which prohibit discrimination based on "marital status" by an employer. RCW 49.60.180(2). In discussing that statute, the court in *Loveland v. Leslie,* 21 Wn. App. 84, 87, 583 P.2d 664 (1978), stated:

Persons of normal intelligence commonly relate the term "marital status" to the existence or absence of a

marriage bond. We hold the statute "provides fair notice" that discrimination based solely on the absence or existence of a marital relationship is prohibited. It is not unconstitutionally vague.

Although respondent correctly points out that this phrase arises in a different statutory context, it does not state any reason why differing contexts should dictate divergent definitions of the same phrase. The debate between the two parties assures us of one thing, at any rate: the phrase "marital status" is not unambiguous and we can only derive its meaning by reference to the purposes of the 1977 amendment to the act which created RCW 50.20.050(4).

Both respondent and the Court of Appeals state the 1977 amendment providing for those who leave work because of "marital status or domestic responsibilities", RCW 50.20-.050(4), must be read in light of prior judicial decisions. In *Ayers v. Department of Employment Security*, 85 Wn.2d 550, 536 P.2d 610 (1975) and *In re Bale*, 63 Wn.2d 83, 85, 385 P.2d 545 (1963), we held that a spouse who leaves work to join his or her spouse in another city demonstrates "good cause" for his or her voluntary termination under RCW 50.20.050. In *Cowles Publishing Co. v. Department of Employment Security*, 15 Wn. App. 590, 550 P.2d 712 (1976), good cause for voluntarily leaving employment was defined as a "compelling reason . . . one which forces or constrains a person to quit her employment against her will." *Id.* at 593.

The Court of Appeals stated:

> RCW 50.20.050(4) was enacted by the legislature, subsequent to the *Ayers, Bale,* and *Cowles* decisions, to clarify compelling personal reasons which would qualify as good cause for voluntary termination of employment.

(Footnote omitted.) *Yamauchi v. Department of Employment Security*, 28 Wn. App. 427, 432, 624 P.2d 197 (1981). This characterization of the reason for the 1977 enactment of RCW 50.20.050(4) is inaccurate. Section 4 of RCW 50.20.050 does not "clarify" good cause; it is an exception to good cause. The new statute is markedly different from its

predecessor.[1] It confines good cause to sections 1 through 3 of RCW 50.20.050. By creating RCW 50.20.050(4) the legis-

---

[1]The old statute read:

"An individual shall be disqualified from benefits beginning with the first day of the calendar week in which he has left work voluntarily without good cause and thereafter until he has obtained work and earned wages of not less than his suspended weekly benefit amount in each of five calendar weeks: *Provided,* That disqualification under this section shall not extend beyond the tenth calendar week following the week in which such individual left work."

The new statute is much more extensive:

"(1) An individual shall be disqualified from benefits beginning with the first day of the calendar week in which he or she has left work voluntarily without good cause and thereafter until he or she has obtained work and earned wages of not less than his or her suspended weekly benefit amount in each of five calendar weeks.

"(2) An individual shall not be considered to have left work voluntarily without good cause when:

"(a) He or she has left work to accept a bona fide job offer; or

"(b) The separation was because of the illness or disability of the claimant or the death, illness, or disability of a member of the claimant's immediate family if the claimant took all reasonable precautions, in accordance with any regulations that the commissioner may prescribe, to protect his or her employment status by having promptly notified the employer of the reason for the absence and by having promptly requested reemployment when again able to assume employment: *Provided,* That these precautions need not have been taken when they would have been a futile act, including those instances when the futility of the act was a result of a recognized labor/management dispatch system.

"(3) In determining whether an individual has left work voluntarily without good cause, the commissioner shall consider the degree of risk involved to the individual's health, safety, and morals, the individual's physical fitness, the individual's ability to perform the work, and such other work connected factors as the commissioner may deem pertinent, including state and national emergencies. Good cause shall not be established for voluntarily leaving work because of its distance from an individual's residence where the distance was known to the individual at the time he or she accepted the employment and where, in the judgment of the department, the distance is customarily traveled by workers in the individual's job classification and labor market, nor because of any other significant work factor which was generally known and present at the time he or she accepted employment, unless the related circumstances have so changed as to amount to a substantial involuntary deterioration of the work factor or unless the commissioner determines that other related circumstances would work an unreasonable hardship on the individual were he or she required to continue in the employment.

"(4) Subsections (1) and (3) of this section shall not apply to an individual whose marital status or domestic responsibilities cause him or her to leave employment. Such an individual shall not be eligible for unemployment insurance benefits until he or she has requalified, either by obtaining work and earning

lature provided for different treatment of persons who voluntarily leave work for reasons of "marital status or domestic responsibilities", such as the circumstances presented in *Bale* and *Ayers* that were previously treated as good cause cases.

WAC 192–16–015 states that where "marital status or domestic responsibilities" are the primary reason for voluntarily leaving employment, the provisions of RCW 50.20-.050(4) shall apply "whether or not the individual took reasonable precautions to preserve his or her employment." This interpretation establishes a less stringent standard than that required for a showing of good cause under the other sections of the statute and WAC 192–16–009(1)(c), and eliminates the requirement derived from *Bale, Ayers* and *Cowles* that all reasonable alternatives to resignation of the job be explored and proven fruitless to establish good cause. *See* 51 Wash. L. Rev. 391, 403 (1976).

At the same time, a person who leaves work with "good cause" under the statute is not treated the same as one who leaves work for reasons of "marital status or domestic responsibilities" under RCW 50.20.050(4). Under the former provision, the individual is entitled to unemployment benefits. Under the latter provision, the individual is subject to limited disqualification until he or she meets the provision's requalification requirements. WAC 192–16–015 carefully ensures that a person who leaves work for good cause under section 2 of RCW 50.20.050 (because of illness, disability or death of a family member) is not subject to limited disqualification under section 4. Good cause insulates a person from disqualification under section 4. WAC 192–16–015 also provides that failure to establish good

wages of not less than the suspended weekly benefit amount in each of five calendar weeks or by reporting in person to the department during ten different calendar weeks and certifying on each occasion that he or she is ready, able, and willing to immediately accept any suitable work which may be offered, is actively seeking work pursuant to customary trade practices, and is utilizing such employment counseling and placement services as are available through the department." RCW 50.20.050.

cause under section 2 will subject a person only to the limited disqualification of section 4 rather than complete disqualification under section 1.

In sum, the 1977 amendments to RCW 50.20.050 provided separate burdens and treatment for persons who leave work for good cause and for reasons of "marital status or domestic responsibilities". If a person were to leave employment with good cause under sections 1 through 3, he or she would be eligible for unemployment benefits. If a person were to leave work for reasons of "marital status or domestic responsibilities", he or she would not need to exhaust all reasonable alternatives to termination (as is required to demonstrate good cause), but at the same time he or she would be subject to a limited disqualification before becoming eligible for benefits.

Respondent's argument that *Bale* and *Ayers* dictate that RCW 50.20.050(4)'s provision for leaving work because of "marital status" is limited to those who are married is attenuated by our above construction of the statute. The phrase "marital status or domestic responsibilities" accommodates a broader range of reasons for leaving work than were presented in *Bale* and *Ayers* while at the same time providing less beneficial treatment for persons under section 4 than for persons who leave work for good cause. *See Bale, supra,* and *Ayers, supra.*

Respondent is concerned that a failure to limit the "marital status" provision to those who are married will leave no way of limiting RCW 50.20.050(4). Since everyone has a "marital status" under Yamauchi's interpretation, everyone will be eligible for treatment under this provision. This argument misconceives the nature of the provision, however.

Although the "marital status or domestic responsibilities" provision does not require exhaustion of all reasonable alternatives to voluntary termination (*see* WAC 192–16–015 and discussion *supra* at 778), the "marital status or domestic responsibilities" justification for leaving work must still "cause" one to leave work. One cannot simply announce

that one is leaving work because one is about to be married and expect to be treated under the provisions of RCW 50.20.050(4). There must be a causal nexus between one's marital status and leaving work. That nexus existed in this case; Yamauchi left work not only to get married but to move to a distant town where commuting to her old job would have been impracticable. Her move to Spokane was directly related to her marriage, and the impracticability of a long commute from Spokane to Pasco is what "caused" her to leave work. Respondent presents no convincing reason why Yamauchi, who quit work to get married and join her husband, should be excluded from treatment under RCW 50.20.050(4), while one who is married and does the same thing should benefit from the terms of the same provision.[2]

Respondent's reliance on a parallel Oregon statute concerning unemployment benefits, Or. Rev. Stat. § 657.176(3) is unpersuasive. The Oregon statute has separate provisions for persons like Yamauchi who leave work to get married, for married persons in situations like that in *Bale* and *Ayers*, and for persons who leave work because of "marital status or domestic duties". These three separate provisions of the Oregon statute can be read as both distinct and overlapping, and thus any inference from the Oregon statute to argue that the Washington provision concerning

---

[2]If the causal relation in *Bale* and *Ayers* was justified by a desire to maintain family unity (*see* 51 Wash. L. Rev. at 401–02, *Ayers*, at 552), that purpose is equally well served in situations like Yamauchi's. The Court of Appeals seemed concerned that persons living together without benefit of the marriage contract would be eligible for treatment under RCW 50.20.050(4). *Yamauchi v. Department of Employment Security*, 28 Wn. App. 427, 434 n.6, 624 P.2d 197 (1981). Arguably, such person could not provide reasons for leaving work that are justified by the purpose of maintaining family unity. Neither party contends nor does the statute contemplate that the term "domestic responsibilities" is limited to those who are married. Therefore, persons in a nonmarried relationship would be clearly within the ambit of that provision. With respect to the term "marital status" the question becomes more difficult. Although the issue is not before us, it is worth noting that a Court of Appeals has excluded such situations from treatment under the state's laws prohibiting discrimination based on "marital status." *McFadden v. Elma Country Club*, 26 Wn. App. 195, 613 P.2d 146 (1980).

"marital status" excludes those who leave work to get married would be speculative at best.

Respondent's only policy argument for why the legislature might have sought to exclude Yamauchi from RCW 50.20.050(4) is one of line drawing. The line drawing problem is not nearly as difficult as respondent imagines.

Respondent cannot seriously contend that Yamauchi did not leave work to get married and move to Spokane. Its primary argument is that leaving work to be married is not included within the reasons for leaving work because of "marital status". If a person were to leave work too long before the ostensible reason for leaving work manifested itself, he or she would risk a finding by the department that the reason for leaving work was not "caused" by that justification. But this is true in every case under RCW 50.20-.050(4) upon which the department makes determinations. The question of sufficient causal nexus is always before the department whether a person is married or not.

In any event, a person in Yamauchi's situation is unlikely to take such a risk by leaving work well before marriage and relocation, since leaving work prior to marriage carries its own adverse consequences. The department will award benefits only as of the time when the causal nexus between marital status and leaving work is manifested. Since Yamauchi left work 8 days before that causal nexus existed, she was not subject to the beneficial provisions of RCW 50.20.050(4) during that 8–day period. Yamauchi became eligible for treatment under the provisions of RCW 50.20-.050(4) only from the time she married and moved to Spokane. Her single marital status did not cause her to leave work. The act of getting married is what necessitated her move.[3] The rigorous reporting requirements of RCW 50.20-.050(4) contemplate as much. One can fulfill those require-

---

[3]This does not imply that Yamauchi needed to marry to fall under the "marital status" provision. It means only that she did not have a marital status reason until she married, just as a person obtaining a dissolution might not have a marital status reason until he or she became single.

ments only as of the time when the "disqualifying act" (in this case marriage and moving) occurs. WAC 192–16–017. Furthermore, unemployment benefits will be completely denied if a person fails to earn "wages in 'employment' in not less than six hundred eighty hours of the individual's base year . . ." RCW 50.04.030.[4]

RCW 50.01.010 states "this title shall be liberally construed for the purpose of reducing involuntary unemployment and the suffering caused thereby to the minimum." Under the interpretation of RCW 50.20.050(4) developed here, a person who leaves work to get married and move to a place where it would be impracticable to commute to her old job leaves work because of marital status. Petitioner Yamauchi may benefit from the provisions of RCW 50.20-.050(4) if, after her marriage and relocation to Spokane, she fulfilled the reporting requirements of that provision.

The Court of Appeals opinion is reversed and the Superior Court decision is reinstated.[5]

ROSELLINI, HICKS, WILLIAMS, and DORE, JJ., concur.

DIMMICK, J. (dissenting)—I respectfully disagree with the majority's conclusion that marital status can mean something other than the state of being married when applied to unemployment compensation. In my opinion, the policy argument for the reason the legislature might have sought

---

[4]RCW 50.04.020 defines "base year":

"'Base year' with respect to each individual, shall mean the first four of the last five completed calendar quarters immediately preceding the first day of the individual's benefit year."

[5]The Superior Court held that Yamauchi was subject to the beneficial provisions of RCW 50.20.050(4) because she left work for reasons of "marital status *or* domestic responsibilities." (Italics ours.) Because of our above discussion of "marital status" we need not decide whether Yamauchi qualifies under the "domestic responsibilities" provision. While the old definition of "domestic responsibilities" in WAC 192–16–015 referred to leaving work because of "home circumstances", the new interpretation of the phrase solely addresses "duties relating to one's immediate family." Although there seems to be an overlap between "marital status" and "domestic responsibilities", Yamauchi's situation seems more applicable to the former provision.

to exclude Yamauchi from RCW 50.20.050(4) as one of line drawing, makes common sense even though rejected by the majority, page 781. In fact, the majority then goes ahead and draws the line, not from the date of her voluntary unemployment, as did the trial court, but from the actual date of her marriage and her move to Spokane. The Court of Appeals, Division Three, in a unanimous decision, upheld the department's determination that the clear statutory language did not allow an unmarried person to voluntarily leave her employment, then qualify under the marital exception. *Yamauchi v. Department of Employment Security,* 28 Wn. App. 427, 624 P.2d 197 (1981). I concur.

Our courts have construed the "good cause" provision of RCW Title 50 to mean a compelling personal reason to voluntarily terminate employment. Case law has considered a compelling personal reason to be one where a wife terminates employment to join her husband and a husband terminates his employment to join the wife. *In re Bale,* 63 Wn.2d 83, 385 P.2d 545 (1963); *Ayers v. Department of Employment Security,* 85 Wn.2d 550, 536 P.2d 610 (1975). The majority would now, after a change in the statute in 1977 following after the *Ayers* and *Bale* cases, disregard that legislative intent which codified the good cause under the preceding two cases, and by judicial legislation declare that marital status should be extended to mean "one about to be married". Our legislature has not expressly provided benefits to individuals who leave work in preparation of marriage, although this could have been accomplished as was done by the State of Oregon.

*In re Bale* decided, at page 91: "it is the duty of the wife to accompany her husband and live at the home he has selected". Therefore, good cause was established for termination of the wife's employment. When the reverse was true, in the *Ayers* case a divided court (Justices Hamilton, Utter and Horowitz dissenting) held that it was a compelling personal reason for a husband to quit his seasonal job to move to a distant town where his wife had obtained

employment. The dissent argued that no compelling personal reason existed in that case and that in our mobile society and economy, it is not uncommon for families to be temporarily separated without adverse effect upon the family relationship and that the husband in that case had made a deliberate, conscious and voluntary decision to quit his job for reasons of personal convenience.

The analysis employed by the court in *Ayers* and *Bale* is applicable in the instant case. The legislature did not intend to include about–to–be–married persons within its marital status exception. Accordingly, Yamauchi, like any other claimant, must establish good cause for an exemption. She should have to show that reasonable alternatives to voluntarily leaving work were not available and that mere matters of personal convenience were not the real reasons for her quitting.

I cannot believe the legislature, in view of the stated purpose of the unemployment act—which is to "lighten its burden which now so often falls with crushing force upon the unemployed worker and his family"—ever meant to cover the situation at bench. It should be noted the distance between Pasco and Spokane is 134 miles. Yamauchi herself indicated she had considered commuting, but she and her husband had only one car. Her husband is a self–employed attorney in the Spokane area. Should not alternatives have been explored? Could they have lived somewhere equi–distant from the two work sites? All these matters are within the determination of the department on a case–by–case basis. Here, the department found no good cause and should be upheld.

Our legislature has clearly determined that a marital status exemption where one party is required to follow a spouse should exist. However, are we to extend the majority's Yamauchi doctrine judicially to cases where live–in couples decide to relocate? Perhaps in some cases good

cause could be shown. That is for the department to determine as long as the legislature has not done so. I therefore would affirm the Court of Appeals.

BRACHTENBACH, C.J., and STAFFORD and DOLLIVER, JJ., concur with DIMMICK, J.