Russell T. JOHNSON,
Plaintiff-Appellant,

v.

DEPARTMENT OF TREASURY, INTERNAL REVENUE SERVICE,
Defendant-Appellee.

No. 81–1501.

United States Court of Appeals,
Fifth Circuit.

March 21, 1983.

John F. Bufe, Washington, D.C., for plaintiff-appellant.

Edward C. Prado, U.S. Atty., San Antonio, Tex., Jeremiah Handy, Asst. U.S. Atty., Robert L. Gordon, Atty., Tax Div., Dept. of Justice, Edward J. Snyder, Atty., John F. Murray, Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Glenn L. Archer, Jr., Richard W. Perkins, Mary L. Fahey, Stephen Gray, Tax Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before THORNBERRY, JOHNSON and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Russell T. Johnson appeals from a judgment of the district court under the Privacy Act, 5 U.S.C. § 552a, granting him minimum statutory damages in the amount of $1000, plus his costs and attorney's fees. On appeal Johnson contends that the district court erred in concluding that "actual damages" under the Privacy Act is limited to out-of-pocket expenses, thereby denying him recovery for his proven and substantial physical and mental damage. This Court holds that the term "actual damages" under the Privacy Act does indeed include damages for physical and mental injury for which there is competent evidence in the record, as well as damages for out-of-pocket expenses. We therefore remand to the district court for a determination of the amount of recovery for Johnson's proven physical and mental injuries.

I. *Background*

Johnson, an attorney, was employed as a revenue officer by the Internal Revenue Service (IRS) from 1962 through 1977. After the Internal Security Division of the IRS received a memorandum from the Internal Audit Division stating that Johnson had received monies in interest from 1969 to 1972, the Internal Security Division opened an investigation of Johnson called a "Special Inquiry Complaint" on October 18, 1974. The inquiry's purpose was to determine whether Johnson's business transactions were proper in view of his employment. On October 24, 1975, this inquiry was converted into a "Conduct Investigation." During both the Special Inquiry

Complaint and the Conduct Investigation, defendant IRS engaged in activities that resulted in numerous contacts with persons other than Johnson. It was not until March 18, 1977 (after this suit was filed), when the IRS inspectors first interviewed Johnson himself, that the Internal Security Division collected any information directly from Johnson. Although the Internal Security Division ceased collecting information about Johnson after April 15, 1977, the investigation was not officially discontinued until March 8, 1978. Prior to that latter date, on December 27, 1977, Johnson retired from the IRS on physical disability.

On January 7, 1977, Johnson brought suit under subsection (g)(1)(D)[1] of the Privacy Act, alleging that the IRS had intentionally violated section 552a(e)(2)[2] of the Act by failing to collect information to the greatest extent practicable directly from Johnson himself. On January 15, 1979, in an order ruling on cross-motions for summary judgment, the district court found an intentional violation of section 552a(e)(2). On February 23–26, 1981, a nonjury trial was held on the issue of damages. The court found that the intentional failure of the IRS to comply with section (e)(2) of the Act had an adverse effect on Johnson, causing him to worry obsessively about the investigation,[3] to incur a dramatic increase in the frequency of his attacks of reflux esophagitis[4] and to suffer mental anxiety from depressive episodes.[5] The court, however, found that

1. 5 U.S.C. § 552a(g)(1)(D) provides as follows:
 (g)(1) *Civil remedies.*—Whenever any agency
 (D) fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

2. 5 U.S.C. § 552a(e)(2) provides as follows:
 (e) *Agency requirements.*—Each agency that maintains a system of records shall—
 (2) collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs; . . . .

3. The court described plaintiff's preoccupation with the investigation as follows:
 The plaintiff did not worry about the fact of the investigation as much as he worried about why he was being investigated and whether he had committed some unknown misdeed or crime. This uncertainty made it impossible for him to place the investigation in its proper psychological perspective. The plaintiff suffered from mental depression. He became irritable at work with his associates and with taxpayers. He became withdrawn, moody, and unsociable, whereas before he had been extroverted and outgoing. Plaintiff lost self-confidence. His sleep patterns changed from that of a sound six-hour sleep to a fitful two or three hours of sleep. He experienced a loss of appetite. His weight decreased from 167 pounds to 155 pounds. He noted a change in his energy level. . . .

4. In his brief, counsel for Johnson describes the condition of reflux esophagitis as follows:
 The condition of reflux esophagitis entails the involuntary regurgitation of stomach acid. During a reflux attack, Johnson first experiences a severe burning sensation in the upper part of his abdomen and chest. During regurgitation, Johnson's esophagus becomes red and inflamed. He experiences nausea, watering of the eyes, running nose, weakness, inability to catch his breath, and a headache develops. These physical phenomena may be mild or severe, depending on whether an attack is mild (1½ hours) [sic] or severe (4–5 hours).
 During a reflux attack, some of the involuntarily regurgitated stomach acid trickles into Johnson's windpipe and makes its way into his lungs where infection can result. Since Johnson's pulmonary condition makes him vulnerable to infection, he must take antibiotics (tetracycline) to combat infection.
 The court found that the increase in frequency of the attacks was as follows:
 Prior to knowing about the investigation, the plaintiff had had a pattern of having minor attacks (of 10 to 20 minutes' duration) about every 10 days, and he had had a pattern of having a major attack (of up to 5 hours' duration) every 1 to 1½ months. After learning about the investigation, however, the pattern of his minor attacks increased to one every 3 or 4 days, and the pattern of his major attacks increased to one about every 10 days.

5. The court, however, found that the violation of § (e)(2) had not caused Johnson to suffer any loss of reputation or to forego the opportunity to engage in the practice of law.

the physical injury (the increase in reflux attacks) and the mental anxiety did not result in an increase in Johnson's out-of-pocket medical expenses. Because the court concluded that "actual damages" recoverable under the Privacy Act is limited to out-of-pocket expenses, the court confined Johnson's recovery to the $1000 statutory minimum plus costs and attorneys' fees.[6] On appeal Johnson argues that "actual damages" is not confined to out-of-pocket losses.

## II. "Actual Damages" Under the Privacy Act

The Privacy Act allows recovery for "actual damages" sustained by an individual as a result of an agency's intentional or willful failure to comply with any provision of the Act which has an adverse effect[7] on the individual. Section 552a(g)(4) states:

> In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—
>
> (A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and
>
> (B) the costs of the action together with reasonable attorney fees as determined by the court.

Johnson argues that the term "actual damages" allowed under the Act encompasses all the ordinary elements of compensatory damages, *e.g.*, mental depression as well as physical injury, if these elements are supported by record evidence. The Government contends that "actual damages" refers only to out-of-pocket or pecuniary losses.

### A. Plain Meaning

■ This Court begins its inquiry with the language of the statute itself. Absent a clearly expressed legislative intent to the contrary, the plain meaning of the language is ordinarily controlling. Johnson and the Government vehemently disagree as to the plain meaning of the term "actual damages." Both parties cite numerous authorities supporting their respective usages of the term. *See, e.g., United States v. State Road Department of Florida,* 189 F.2d 591, 596 (5th Cir.1951), *cert. denied,* 342 U.S. 903, 72 S.Ct. 291, 96 L.Ed. 676 (1952); *contra Morvant . v. Lumbermens Mutual Casualty Co.,* 429 F.2d 495, 496 (5th Cir.1970). After a review of the cited authorities, this Court concludes that the term "actual damages" has no plain meaning or consistent legal interpretation.

### B. Legislative History

■ Because the plain meaning of the term "actual damages" is uncertain, we seek illumination in the legislative history of the Act. In attempting to discern congressional intent from an examination of the legislative history of a statute, the Court looks to "the purpose the original enactment served, the discussion of statutory meaning in committee reports, the effect of amendments—whether accepted or rejected—and the remarks in debate preceding passage." *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1080 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980).

#### 1. Purposes of the Act

■ This Court has not heretofore sought to determine the meaning of "actual damages" in the Privacy Act. In construing a statute, the court's "task is to interpret the words of [the statute] in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 1911, 60 L.Ed.2d

---

**6.** On September 24, 1981, in its "Amended Findings of Fact and Conclusions of Law on Attorneys' Fees," the court awarded the National Treasury Employees Union Legal Services Program $24,438.57 in attorneys' fees and costs.

**7.** *See* 5 U.S.C. § 552a(g)(1)(D), *quoted in* note 1, *supra.*

508 (1979). The purpose of the Privacy Act is set forth in its preamble:

> (b) The purpose of this Act [enacting this section and notes set out under this section] is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—
>
> \* \* \* \* \* \*
>
> (6) be subject to civil suit for *any damages* which occur as a result of willful or intentional action which violates any individual's rights under this Act.

§ 2(b), Privacy Act, 5 U.S.C. § 552a note, *reprinted in* 1974 U.S.Code Cong. & Ad. News 2177, 2178 (emphasis added). Further enlightenment on the congressional purpose in enacting the Privacy Act is found in a report from the Committee on Government Operations which recommended passage of the Senate Bill:

> The purpose of S. 3418, as amended, is to promote governmental respect for the privacy of citizens by requiring all departments and agencies of the executive branch and their employees to observe certain constitutional rules in the computerization, collection, management, use, and disclosure of personal information about individuals.
>
> \* \* \* \* \* \*
>
> It is designed to prevent the kind of illegal, unwise, overbroad, [sic] investigation and record surveillance of law-abiding citizens produced in recent years from actions of some over-zealous investigators, and the curiosity of some government administrators, or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies.
>
> It is to prevent the secret gathering of information on people or the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch.
>
> It is designed to set in motion for long-overdue evaluation of the needs of the Federal Government to acquire and retain personal information on Americans, by requiring stricter review within agencies of criteria for collection and retention.
>
> It is also to promote observance of valued principles of fairness and individual privacy by those who develop, operate, and administer other major institutional and organizational data banks of government and society.

S.Rep. No. 1183, 93rd Cong., 2d Sess. 1–2, *reprinted in* 1974 U.S.Code Cong. & Ad. News 6916, 6917 (hereinafter USCAN), *and in* Legislative History of the Privacy Act of 1974, at 154–55 (1976) (hereinafter Sourcebook). The report states that "[t]he premise underlying this legislation is that good government and efficient management require that basic principles of privacy, confidentiality and due process must apply to all personal information programs and practices of the Federal Government . . . ." *Id.* at 14, USCAN at 6929, Sourcebook at 167. The report defines the concept of "privacy" as follows:

> "Privacy", then, is a shorthand term for the restraint on the power of government to investigate individuals, to collect information about their personal lives and activities in society or in ways which are banned by the Constitution, or for reasons which have little or nothing to do with the purpose of government or of the agency involved, as their powers are defined by the Constitution and specific statutes.

*Id.* at 17, USCAN at 6932, Sourcebook at 170.

Senator Goldwater, a cosponsor of an amendment to S. 3418, explained what the concept of "privacy" entails:

> By privacy, I mean . . . the right to be protected against disclosure of information given by an individual in circumstances of confidence, and against disclosure of irrelevant embarrassing facts relating to one's own private life, both rights having been included in the authoritative definition of privacy agreed upon by the International Commission of Jurists at its world conference of May, 1967.

By privacy, I also mean what the U.S. Supreme Court has referred to as the embodiment of "our respect for the inviolability of the human personality," and as a right which is "so rooted in the traditions and conscience of our people as to be ranked as fundamental."

120 Cong.Rec. 36,904 (1974), *reprinted in* Sourcebook at 803. The purpose of the Privacy Act is succinctly summarized in a statement by Senator Erwin, a co-sponsor of S. 3418:

> The reforms wrought by S. 3418 have been a long time coming. This is true despite the fact that the principles it implements, of fair, honest, and responsible behavior by Government toward its citizens, are those recognized values of Western jurisprudence and democratic constitutional government. More important, they are the principles upon which our own Constitution rests. Their restatement as legislative guarantees are vital today.

*Id.* at 36,891, Sourcebook at 769. In construing the statutory language, this Court must focus on "the purposes Congress sought to serve," since the interpretation this Court gives to the phrase "actual damages" must clearly conform to the purpose of the Act.

 Keeping in mind that the basic purpose of the Act is to protect an individual against an "invasion of personal privacy," the Court notes that in the Act's preamble, Congress stated that "the right to privacy is a personal and fundamental right protected by the Constitution of the United States." Section 2(a)(4), Privacy Act, 5 U.S.C. § 552a note, *reprinted in* 1974 USCAN 2177, 2178. The "zone of privacy" safeguarded by the Constitution includes "the individual interest in avoiding disclosure of personal matters." *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977).

Further corroboration of the fundamental importance accorded to the right of privacy by Congress is found in the words of Senator Nelson during debate over S. 3418: [8]

> [U]ncontrolled Government snooping is a dangerous assault on our constitutional liberties. Those liberties are the cornerstone of our democratic system and any assault on them cannot be treated lightly. A society cannot remain free and tolerate a Government which can invade an individual's privacy at will.
>
> Government snooping is particularly dangerous because often it is executed without the knowledge or approval of those officials who are accountable to the public. This, in turn, increases the probability that Government invasions of individual privacy, as well as other fundamental constitutional liberties, will be accomplished by illicit means and for illegitimate purposes.

120 Cong.Rec. at 36,901, Sourcebook at 797. The Senator characterized the right to privacy as "one of our most cherished liberties" and as "fundamental to the concept of democratic self-government where each individual's private thoughts and beliefs are beyond the reach of Government...." *Id.* at 36,902, Sourcebook at 799. He declared that "[a] right so vital to individual liberty and, indeed, to our constitutional system deserves rigorous protection by Congress ...." *Id.,* Sourcebook at 800.

It is instructive to review the conclusion at which the Tenth Circuit arrived after its examination of legislative history, especially the legislative history of the remedial provision of the Act.[9] That court concluded that when Congress conferred standing to sue on an individual who has suffered an "adverse effect," "Congress was borrowing

---

**8.** Senator Nelson introduced an amendment to create a Joint Committee on Government Surveillance and Individual Rights to provide legislative oversight of the surveillance activities of all the agencies of the federal government.

**9.** The remedial provision, § 552a(g)(1), is quoted at note 1, *supra.* The "adverse effect" language in this provision came from the House bill. The Senate bill's comparable provision had granted standing to any "aggrieved person" and was "designed to encourage the widest possible citizen enforcement through the judicial process." S.Rep. No. 1183 at 83, USCAN at *6997,* Sourcebook at 236.

from the common law tort of invasion of privacy."[10] *Parks v. Internal Revenue Service,* 618 F.2d 677, 682–83 (10th Cir.1980). That court stated that the invasion of a personal right is the essence of a common-law tort action for invasion of privacy. *Id.* at 683. The court held that mental distress or psychological harm, as a natural and probable consequence of an invasion of privacy, is a sufficient "adverse effect" to confer standing. *Id.*

If Congress borrowed from the common law in designing the remedy provision, surely Congress was not unmindful of the common law when it selected the words "actual damages" for the accompanying damage provision. The Supreme Court has indicated that the primary damage in "right to privacy" cases is mental distress. *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534 n. 9, 17 L.Ed.2d 456 (1967). Additionally, the Supreme Court has stated that

> the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question—just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law.

*Carey v. Phiphus,* 435 U.S. 247, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978).[11] Logically, then, Congress, in choosing the term "actual damages" was tailoring the compensation to the nature of the privacy interest protected. Obviously, mental distress is the normal and typical damage resulting from an invasion of privacy, an invasion of "our respect for the inviolability of the human personality." *See* Senator Goldwater, *supra* at 9. Interpreting "actual damages" to include only out-of-pocket losses would not only preclude recovery[12] in large numbers

of cases but also run counter to Congress' intent to "promote governmental respect for the privacy of citizens by requiring ... agencies and their employees to observe ... constitutional rules." Furthermore, such a restrictive interpretation would inhibit rather than encourage the "widest possible citizen enforcement." *See* S.Rep. No. 1183 at 1 & 83, USCAN at 6916 & 6997, Sourcebook at 154 & 236. In addition, confining "actual damages" to out-of-pocket losses would lessen government motivation to comply with the Act and thereby run counter to Congress' intent to "promote observance of valued principles of fairness and individual privacy by those who develop, operate, and administer ... government and society." *See id.* at 2, USCAN at 6917, Sourcebook at 155. Such an interpretation would not, therefore, promote the implementation of "fair, honest, and responsible behavior by Government toward its citizens," "principles upon which our ... Constitution rests." *See* 120 Cong.Rec. at 36,891, Sourcebook at 769. A federal act affording special protection to the right of privacy can hardly accomplish its purpose of protecting a personal and fundamental constitutional right if the primary damage resulting from an invasion of privacy is not recoverable under the major remedy of "actual damages" that has been provided by Congress.

As previously noted, the Supreme Court has recognized that an award of compensatory damages for "distress" (mental suffering or emotional anguish) is an appropriate remedy for deprivation of a constitutional right depending on the nature of the interests protected by the particular right. *Carey,* 98 S.Ct. at 1052–53. Further guidance on compensation for constitutionally protected rights can be found from two other

---

**10.** This Court notes that a statement by Senator Muskie, a co-sponsor of S. 3418, indicates that Congress did indeed borrow from the common law tort: "The Federal Privacy Act draws upon the constitutional and judicial recognition accorded to the right of privacy and translates it into a system of procedural and substantive safeguards against obtrusive Government information gathering practices." 120 Cong.Rec. at 36,897, Sourcebook at 784.

**11.** Although the Court was referring to damage awards under 42 U.S.C. § 1983, it is clear from the opinion as a whole that the Court's reasoning was not confined to § 1983. *See Carey,* 98 S.Ct. at 1053.

**12.** The statutory minimum of $1000, of course, is recoverable.

circuits. The Eighth Circuit has stated that "[a]lthough it is admittedly difficult to place a value upon the resulting emotional injury from the deprivation of a constitutional right, the common law has historically recognized a reasonable, and sometimes substantial, sum of damages for mental distress." *Williams v. Trans World Airlines, Inc.,* 660 F.2d 1267, 1273 (8th Cir.1981).[13] Finally, the D.C. Circuit, finding recovery for established emotional distress and mental anguish appropriate for violation of fourth amendment rights,[14] stated:

> This court has held that in cases involving constitutional rights, compensation "should not be approached in a niggardly spirit. It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right * * *" Specifying such damages will always be difficult, but they must be at least "an amount which will assure [the plaintiff] that [personal] rights are not lightly to be disregarded and that they can be truly vindicated in the courts.

*Halperin v. Kissinger,* 606 F.2d 1192, 1208 (D.C.Cir.1979), *aff'd by an equally divided Court in part, cert. dismissed in part,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (per curiam), *reh'g denied,* 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1024 (1981).

### 2. *Amendments Rejected*

While Congress expressed some concern over the scope of potential government liability for damages under the Act,[15] this concern was in no way intended to limit the recovery of damages for loss of reputation, embarrassment, and other forms of emotional distress. The House Bill, H.R. 16373, as reported from the Committee on Government Operations,[16] provided for actual damages [17] for a willful, arbitrary, or capricious violation by an agency. H.R.Rep. No. 16373, 93d Cong., 2d Sess. 31 (1974), *reprinted in,* Sourcebook at 288. In its consideration of H.R. 16373, the House rejected two amendments which are relevant to our inquiry: an amendment providing for punitive damages and a separate amendment making the Government liable for a negligent violation.[18] The first of these, Representative Fascell's amendment, provided for punitive damages (in the case of a willful, arbitrary, or capricious violation). It was rejected largely because of congressional concern over the budgetary effect of punitive damages.[19] Representative Eckhardt

---

**13.** *Williams* was a Title VII case.

**14.** The D.C. Circuit's opinion also examined the applicability of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (prohibiting the interception or disclosure of a "wire communication"), 18 U.S.C. §§ 2510–2520, which provides for "actual damages." The court, however, did not discuss whether recovery for emotional distress was appropriate as an element of "actual damages" under Title III. The court examined the appropriateness of compensation for the intangible injury of mental anguish from a fourth amendment perspective only.

**15.** *See Fitzpatrick v. IRS,* 665 F.2d 327, 330 (11th Cir.1982); *see also Houston v. U.S. Dept. of Treasury,* 494 F.Supp. 24, 30 (D.D.C.1979) (Congress was "concerned about the drain on the treasury created by a rash of Privacy Act suits").

**16.** The original House bill reported by the subcommittee provided for punitive damages if a violation was willful. H.R.Rep. No. 16373, 93d Cong., 2d Sess. 12 (1974), *reprinted in* Sourcebook at 250–51. The punitive damage provision was deleted by the full committee by an 18–14 vote. 120 Cong.Rec. at 36,660, Sourcebook at 924.

**17.** All the versions of the bills, both House and Senate, provided for costs and attorney's fees. Since this provision is not relevant to this Court's inquiry, references to costs and attorney's fees are omitted.

**18.** Some concern was expressed that this amendment, because it contained no standards of conduct, made the Government liable even in the absence of negligence.

**19.** Objection was also voiced to the punitive damage provision on the ground that it would have just the opposite effect on Government employees that Congress desired—employees would be tempted to withhold information, thereby risking ordinary damages, rather than to reveal information, thereby subjecting their agencies to punitive damages if the determination was later made that they revealed the information improperly. 120 Cong.Rec. at 36,-659, Sourcebook at 921.

stated that "the primary objection to the Fascell amendment was that the Government should not be subjected to punitive damages."[20]

Similarly, the rejection of the amendment offered by Representative Moorhead (making the Government liable for a negligent violation) did not evidence any congressional concern whatsoever over the effect of making the Government liable for damages in excess of out-of-pocket damages. This amendment made the standard of liability that of an agency failure or refusal to comply with the Act. Much concern was expressed over the budgetary effect of liability on the Government for this lesser standard of conduct (mere negligence) or for a standard of absolute liability.[21] Nowhere does the legislative history intimate that there was any congressional concern whatsoever regarding making the Government liable for proven damages in excess of out-of-pocket losses.

### 3. *Debate Preceding Passage*

Other remarks in the debate preceding passage of H.R. 16373 undergird an inter-

---

**20.** Some of the remarks made during debate preceding the rejection of the Fascell amendment were as follows:

> Mr. Butler: May I fairly observe there is no sovereignty in the world that exposes itself to punitive damages by a statute of this nature?
>
> \* \* \* \* \* \*
>
> Mr. McCloskey: I think we have made an exhaustive study of the statutes of this Nation, and if we are to adopt by this amendment punitive damages, it would be the first time in history that the United States has made itself subject to punitive damages for any cause or in any case. We have adopted six or seven provisions by statute to impose attorney's fees against the United States, but this would be the first time for punitive damages.
>
> I would like to ask the gentleman ..., is it not true that there would be no way of ascertaining in advance of any one year, when this Congress is ascertaining the budget, what might possibly be the amount of damages that might be awarded?

*Id.,* Sourcebook at 921. Representative McCloskey continued:

> I think it is wrong to make the Government of the United States and this congressional budget subject to an absolutely incalculable amount of liquidated damages. If we had a hundred lawsuits, and if we had a hundred verdicts of $1 million each, there would be no guarantee in any way that this Congress could protect itself against that liability. It seems to me, when we balance the rights of the individual against the Government, that *to add punitive damages* and to set this kind of precedent is an unfortunate mistake. It would be the first time in history this has occurred.
>
> \* \* \* \* \* \*
>
> Why should we make invasion of privacy a special right with this extraordinary remedy?

*Id.,* Sourcebook at 922 (emphasis added).

> \* \* \* \* \* \*
>
> Mr. Erlenborn: In exercising the proprietary functions, the Government can be liable; but it would be, as has been pointed out by others debating this amendment, unprecedented to make Government liable for punitive damages, because there has been no precedent in the past for making any Government liable for punitive damages.

*Id.* at 36,660, Sourcebook at 924.

**21.** A statement made by Representative Erlenborn captures this concern:

> There are no standards of conduct required under this amendment. This amendment would make the Government a guarantor of the accuracy of everything that it has in its files.
>
> The amendment says that any suit brought under subsection (g)(1)(B), (C) of this section does not have to refer to any standards of conduct. What do (g)(1)(B) and (C) require? (B) requires that the agency maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness.
>
> Now, if there is any inadvertent inaccuracy in a government file, a suit could be filed under this amendment, and damages asked and recovered.
>
> (C) says:
>
> > ... fails to comply with any other provision of this action, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency ....
>
> Again, this provision prescribes no standard of conduct. If a Government agency inadvertently violated any rule—whether a mistake be inadvertent or willful—a suit could be brought under this amendment for damages. This exposes the Government to undue liability. It makes the Government the guarantor of every piece of information that it has in every one of its files. It is not even prospective; this would be retroactive—Government employees would have to go through and clean up all their files so that they would not expose themselves to such liability.

*Id.* at 36,956, Sourcebook at 926–27.

pretation of "actual damages" exceeding mere out-of-pocket expenses. Another representative was attempting to make the point that the Fascell amendment, by making actual damages available to an individual injured by an unintentional violation, corrected what in his opinion was a flaw in the bill. Representative McCloskey then made a significant statement concerning actual damages: "I do not believe that the individual is denied actual damages if he can prove them. In cases of this kind, of course, it is quite often difficult to prove actual damages, but that is not necessarily a reason to establish the extraordinary remedy of punitive damages." *Id.* at 36,659–60, Sourcebook at 923. His statement evidences two points. First, actual damages must be *proven* damages—an individual is entitled to them only if he proves them. Second, if actual damages are hard to prove, they would appear not to be limited to out-of-pocket losses: these losses are "quite easy" rather than "quite ... difficult" to prove.[22]

A statement made by Representative McCloskey during debate over the Fascell amendment lends additional credence to an interpretation of "actual damages" which would allow recovery for proven elements which are difficult to quantify, such as mental distress. In speaking against a punitive damage provision because of the negative effect it would have on employees, Representative McCloskey referred to "actual damages" as "ordinary damages": "If [the employee] withholds information, on the other hand, he is subject only to ordinary damages, attorneys' fees, and costs." *Id.* at 36,659, Sourcebook at 921. Certainly "ordinary damages" are compensatory damages—not damages for out-of-pocket loss alone.

A comment made during debate by Representative Moorhead himself concerning his amendment must also be considered. It provides additional support for interpreting "actual damages" as "proven damages." Prefacing his remarks with the statement that this amendment did not provide for punitive damages,[23] Representative Moorhead pointed out that the amendment placed the burden on the citizen who, in order to recover, would have to prove violation, causation, and damages.

The amendment does not contain a provision for punitive damages, which was objected to yesterday. There is nothing in this amendment, therefore, which subjects the Government to an undue burden. The burden is on the citizen. The citizen must prove that there was a violation of the provision of this act. He must then prove that the adverse determination which damaged him was caused by the above violation. He must finally prove the damages caused by the violation.

*Id.* at 36,955, Sourcebook at 925. Clearly, Representative Moorhead's comment provides additional support for interpreting "actual damages" as "proven damages."[24]

---

22. The Court recognizes this statement is ambiguous. On one hand, actual damages may be hard to prove because they encompass elements of mental suffering on which it is difficult to put a dollar value. On the other hand, actual damages may be hard to prove from a causation point of view.

23. The House had expressed its objection to punitive damages the day before by rejecting Representative Fascell's amendment.

24. A single comment made by Representative Eckhardt immediately following Representative Moorhead's statement might, at first glance, seem to provide support for an out-of-pocket definition of actual damages: "There is nothing in this that would provide for any damages beyond ·his actual out-of-pocket expenses." 120 Cong.Rec. at 36,956, Sourcebook at 926.

The Court in *Houston v. United States Dept. of Treasury,* 494 F.Supp. at 30 n. 13, seized on Representative Eckhardt's comment, which passed unchallenged, to support a congressional intent to limit "actual damages" to out-of-pocket expenses. Representative Eckhardt's statement must, however, be placed in the context of the debate. He was urging the passage of an amendment which allowed recovery on the basis of an agency's failure or refusal to comply with the Act without any showing of willful, arbitrary or capricious action as was required by the bill under consideration. The day before, Congress had rejected an amendment providing for punitive damages out of a concern that such damages would expose the Government to undue liability. Representative Eckhardt wanted to make clear that his amendment, although it did not require willful, arbitrary, or capricious action by the agency, did

### 4. *The Final Compromise*

The Senate bill, S. 3418, as reported from the Committee on Government Operations, provided for actual damages for violation of any provision and punitive damages where appropriate. S. 3418, as passed by the Senate on November 21, 1974, (and referred to the House) provided for actual and general damages with a minimum recovery of $1000 for any violation.[25] This was the first appearance of "general damages"; it appeared simultaneously with the $1000 floor on recovery.

The House bill, H.R. 16373, as reported from the Committee on Government Operations, provided for actual damages for willful, arbitrary, or capricious agency action. The Senate bill, S. 3418, as amended by the House, provided for actual damages for willful, arbitrary, or capricious agency action. The term "general damages" dropped out of the Senate bill at this point. Senate bill, S. 3418, as passed with compromise amendments provided for "actual damages" for willful or intentional agency action and a floor recovery of $1000. Senator Erwin remarked that the compromise relating to damages[26] was over the *standard of recovery:*[27]

The standard for recovery of damages under the House bill would have rested on the determination by a court that the agency acted in a manner which was willful, arbitrary, or capricious. The Senate bill would have permitted recovery against an agency on a finding that the agency was negligent in handling his records.

These amendments represent a compromise between the two positions, permitting an individual to seek injunctive relief to correct or amend a record maintained by an agency. In a suit for damages, the amendment reflects a belief that a finding of willful, arbitrary, or

not provide for punitive damages. He had postulated the case of a person who lost a job opportunity because his record inaccurately indicated that he had been discharged from a prior job. The inaccuracy in the record was due to a simple innocent mistake of a government agent rather than to any type of willful action. First, Representative Eckhardt's statement about "out-of-pocket" expenses was specifically directed to his particular example—the person who had lost a job because of the error. Little in this purely hypothetical example would have prompted a comment on damages for mental suffering. Secondly, it is clear from the way his statement was prefaced ("there is nothing in this ....") that it was to remind Congress that his amendment did not provide for punitive damages which Congress had previously rejected.

This Court is convinced that Representative Eckhardt's statement, viewed in context, does not support an out-of-pocket definition of actual damages. In any event, it should be remembered that the amendment Representative Eckhardt was referring to was defeated. Furthermore, even if the comment were construed to support an out-of-pocket definition, other statements by other representatives counterbalance the comment.

**25.** The *Fitzpatrick* opinion reported that "[a]fter much debate, the 'punitive damages' language was deleted in favor of a provision for 'actual and general damages.'" 665 F.2d at 330 (*citing* Sourcebook at 371). The page cited contains only the civil remedy provision of S. 3418 as passed by the Senate. This Court has been unable to discover one word of debate over the removal of the punitive damage provision, the addition of "general damages," or the addition of the $1000 floor on recovery. *See* 120 Cong.Rec. at 36,885–36,917, "Senate Considers S. 3418 as Reported by the Committee on Government Operations," Sourcebook at 763–838. The change in the civil remedy provision is reported only as a Committee amendment to S. 3418 which was drafted after the bill was reported on August 20, 1974, by the Committee on Government Operations. *Id.* at 36,891, Sourcebook at 768.

**26.** Remarks made by the Senator that are not quoted indicate that there was also a compromise relative to injunctive relief.

**27.** The *Fitzpatrick* opinion viewed the compromise as a lowering of the standard for recovery ("willful, arbitrary, or capricious" to "willful or intentional") in return for ("in an obvious quid pro quo") the deletion of any recovery for general damages. This Court finds no support in the legislative history for this conclusion. On the contrary, Senator Erwin, in discussing the study authority of the Privacy Protection Study Commission, stated that the question of whether the federal government should be liable for general damages resulting from a willful or intentional violation was one of the issues not included in the compromise between the House and Senate bills. 120 Cong.Rec. at 40,405, Sourcebook at 859.

capricious action is too harsh a standard of proof for an individual to exercise the rights granted by this legislation. Thus the standard for recovery of damages was reduced to "willful or intentional" action by an agency. On a continuum between negligence and the very high standard of willful, arbitrary, or capricious conduct, this standard is viewed as only somewhat greater than gross negligence.

120 Cong.Rec. at 40,406, Sourcebook at 862. The compromise relative to damages, then, was between a "negligence" standard and a "willful, arbitrary, or capricious" standard.

Regarding the deletion of "general damages," all the legislative history tells us is that (1) the House omitted the term "general damages" when it amended S. 3418 and the term was never reinserted, and (2) Senator Erwin noted that one of the areas encompassed within the study authority of the Privacy Protection Study Commission was the question of whether the federal government should be liable for general damages occurring from a willful or intentional violation.[28] *Id.* at 859.

The total lack of information concerning the deletion of the term "general damages" prohibits this Court from concluding that "actual damages" refers to out-of-pocket loss only.[29] Indeed, a brief glance at *Black's Law Dictionary* suggests at least two other equally plausible conclusions. According to *Black's*[30] "compensatory or actual damages" can be subdivided into general and special damages. If general damages is a mere category of "actual dam-

ages," then there would be no need to separately specify them. A second and even more likely explanation for the disappearance of "general damages" is that Congress was using the term to mean "presumed damages"[31] and the term "actual damages" to mean "actual injury" in defamation cases.[32] Therefore, in deleting the term "general damages," Congress was rejecting liability for presumed damages. Since *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) was decided several months before Congress debated the Privacy Act legislation, it is not at all improbable that Congress was thinking in terms of "defamation language." The Court in *Gertz* stated:

The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred. The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms. Additionally, the doctrine of presumed damages invites juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false

---

**28.** The Act itself instructed the Commission to study this question. § 5(c)(2)(B)(iii), Privacy Act, 5 U.S.C. § 552a note. The Commission was set up as a two-year study commission to examine various aspects of the Act and make reports to Congress and to prepare model privacy legislation. *See id.* § 5.

**29.** This Court thinks it is a nonsequitur to conclude that "actual damages" must refer to out-of-pocket loss based on the fact that the Senate bill provided for recovery of both "actual and general" damages with "general damages" later being deleted. *See Fitzpatrick,* 665 F.2d at 330.

**30.** Black's Law Dictionary 352 (5th ed. 1979).

**31.** The first definition of "general damages" in *Black's* is "[s]uch as the law itself implies or presumes to have accrued from the wrong complained of . . . ." *Id.* at 353.

**32.** The Court in *Houston,* 494 F.Supp. at 30 n. 16, dismissed the analogy to the language in defamation cases out-of-hand, stating that "This definition of 'actual injury' in defamation cases under state law is not controlling in a statutory action for 'actual damages' under the Privacy Act." *Id.*

fact. More to the point, the States have no substantial interest in securing for plaintiffs such as this petitioner gratuitous awards of money damages far in excess of any actual injury.

We would not, of course, invalidate state law simply because we doubt its wisdom, but here we are attempting to reconcile state law with a competing interest grounded in the constitutional command of the First Amendment. It is therefore appropriate to require that state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved. It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

94 S.Ct. at 3011–12 (emphasis added). If Congress was using "actual damages" as synonymous with "actual injury," then the deletion of "general damages" would have only indicated a congressional intent to require competent evidence in the record to support the injury. The various references in the legislative history to the fact that damages have to be proven lend support to the theory that Congress was using "defamation" jargon.[33]

### C. The Interpretation of the Term "Actual Damages" in Other Federal Statutes

■ Congress has seen fit to use the term "actual damages" in other federal statutes. Prior to the passage of the Privacy Act, the term "actual damages" in the Fair Housing Act, 42 U.S.C. § 3612(c), had been interpreted by the courts to include damages for emotional distress and humiliation as well as out-of-pocket loss. *Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119 (7th Cir.1974); *Seaton v. Sky Realty Co.*, 491 F.2d 634 (7th Cir.1974); *Steele v. Title Realty Co.*, 478 F.2d 380 (10th Cir.1973); *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344 (7th Cir.1970).[34] It is appropriate to charge Congress in the exercise of its legislative function with knowledge of these federal court precedents. *See Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560 (1979).

Two other statutory civil liability sections which provide for "actual damages" are particularly significant: 15 U.S.C. § 1681n and 15 U.S.C. § 1681e. Both sections are part of the Fair Credit Reporting Act, 15

**33.** The Privacy Protection Study Commission concluded that Congress intended the term "actual damages" in the Privacy Act to be synonymous with "special damages" (tangible out-of-pocket losses) in defamation cases. This Court does not find the Commission's conclusion to be persuasive since the Commission's report indicated only that the basis of its conclusion was "[t]he legislative history and language of the Act," without any further discussion whatsoever of either the legislative history or the language of the Act. Report of the Privacy Protection Study Commission, Appendix 4, "The Privacy Act of 1974: An Assessment" at 105 (1977). Clearly, the language of the Act is ambiguous, and this Court's independent analysis of the legislative history of the Act leads to a contrary conclusion.

It is interesting to note that the Commission's recommendation was that Congress amend the Privacy Act to include recovery for intangible injuries. *Id.* at 106. "If the rights and interests established by the Privacy Act are worthy of protection, then recovery for intangible injuries such as pain and suffering, loss of reputation, or the chilling effect on constitutional rights, is a part of that protection." *Id.* at 105.

**34.** This interpretation has continued after passage of the Privacy Act. *See, e.g., Smith v. Anchor Bldg. Corp.*, 536 F.2d 231, 236 (8th Cir.1976).

U.S.C. § 1681 *et seq.*[35] Both sections allow recovery for "actual damages" and both have been interpreted to allow recovery for emotional distress and humiliation.[36] Although this Court realizes it would not be fair to charge Congress with knowledge of the case law construing "actual damages" under the Fair Credit Reporting Act,[37] this Court thinks that the interpretation of "actual damages" under this consumer protection legislation provides a persuasive analogy for the interpretation of that term under the Privacy Act. First, Congress was well aware of the existence of the Fair Credit Reporting Act and referred to it on at least two occasions during the debate preceding passage of the Privacy Act. An analogy was made to the Fair Credit Reporting Act concerning the costs of implementation of safeguards provided by the Privacy Act. S.Rep. No. 1183 at 84–85, USCAN at 6998–99, Sourcebook at 237–38. In addition, Representative Erlenborn, in connection with an amendment he offered to the Privacy Act, referred to how the Fair Credit Reporting Act provided protection for the confidentiality of sources. 120 Cong.Rec. at 36,646, Sourcebook at 889. Congress, therefore, had the Fair Credit Reporting Act in mind when it was debating the Privacy Act legislation. Secondly, the Fair Credit Reporting Act and the Privacy Act were congressional responses to the need for the individual privacy guaranteed by the Constitution. In the Fair Credit Reporting Act, Congress specifically found that there was "a need to insure that consumer reporting agencies exercised their grave responsibilities with . . . a respect for the consumer's

right to privacy." 15 U.S.C. § 1681(a)(1)(4). Indeed, the courts have found that the purpose of the Fair Credit Reporting Act was to prevent unreasonable or careless invasion of consumer privacy. *See, e.g., In re TRW, Inc.,* 460 F.Supp. 1007 (D.Mich.1978).

Given that the purposes of the two acts are similar and given that the legislative history of the Privacy Act includes specific references to the Fair Credit Reporting Act, this Court thinks it appropriate to look to how the courts have interpreted the term "actual damages" in the Fair Credit Reporting Act. The "actual damages" recoverable under section 1681n, imposing civil liability for willful noncompliance by any consumer reporting agency, have been uniformly interpreted to include mental anguish as an element of recovery. *See, e.g., Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 834–35 (8th Cir.1976), *aff'g* 383 F.Supp. 269, 276 (E.D.Mo.1974); *Bryant v. TRW, Inc.,* 487 F.Supp. 1234, 1240 (E.D.Mich.1980). In allowing recovery of actual damages for mental pain and anxiety, the Eighth Circuit refused to apply the rule in tort which precludes recovery for mental anguish alone:[38] "[T]he rule is inapplicable because . . . [plaintiff] has an independent cause of action under the Fair Credit Reporting Act quite apart from any recovery he might have sought in tort." *Millstone,* 528 F.2d at 834–35. The *Millstone* court affirmed the district court which had awarded plaintiff $2500 in actual damages for his mental anguish and symptoms of sleeplessness, nervousness, and frustration "which were amply testified to," although he had suffered "no lost wages nor incurred medical

---

**35.** Section 1681n(1) imposes liability for "actual damages" sustained by a consumer on any consumer reporting agency or user of information which willfully fails to comply with any requirement of the Act.

Section 1691e(a) imposes civil liability for "actual damages" sustained by an aggrieved applicant (in either an individual or a class capacity) on any creditor who fails to comply with any requirement of the Act.

**36.** *See* cases cited *infra* at 984–985.

**37.** For the most part, the cases were decided after the Privacy Act became law on December 31, 1974. *Millstone v. O'Hanlon Reports, Inc.,*

383 F.Supp. 269 (E.D.Mo.1974), *affirmed,* 528 F.2d 829 (8th Cir.1976), however, was decided on October 24, 1974, while the Privacy Act legislation was being debated.

**38.** This Court notes that in the case at bar the district court specifically found that Johnson suffered physical consequences (the illness of mental depression and an increase in reflux esophagitis attacks) as a result of his emotional distress. The tort rule disallowing recovery for mere mental anguish in the absence of physical consequences would therefore be inapplicable in any event.

expenses on account of the injuries." 383 F.Supp. at 276. Furthermore, the Court in *Bryant* held that proven embarrassment and humiliation were both proper elements of damages for jury consideration although there was not out-of-pocket expense. 487 F.Supp. at 1240.[39]

In addition, the "actual damages" recoverable under section 1691e, imposing liability on any creditor who fails to comply with any requirement of the Fair Credit Reporting Act, have been interpreted to compensate for emotional harm. *Owens v. Magee Finance Service, Inc.*, 476 F.Supp. 758, 770 (E.D.La.1979) (allowing "actual damages" for mental anguish and humiliation); *Shuman v. Standard Oil Co.*, 453 F.Supp. 1150, 1153–54 (N.D.Cal.1978) (also allowing harm to one's "reputation for creditworthiness" as an element of "actual damages").[40]

**39.** The instruction to the jury on damages in *Bryant* was as follows:

If your verdict is for plaintiff, for negligent non-compliance, then your duty is to determine the amount of money which reasonably, fairly, and adequately compensates him for the damage which you decide resulted from defendant's failure to comply. You should include each of the following elements of damage which you decide has been sustained by the plaintiff to the present time:
(a) mental anguish;
(b) embarrassment;
(c) humiliation.

You should also include each of the following elements of damage which you decide plaintiff is reasonably certain to sustain in the future:
(a) mental anguish;
(b) embarrassment;
(c) humiliation.

If any element of damage is of a continuing nature, you shall decide how long it may continue.

Which, if any, of these elements of damage has been proved by plaintiff is for you to decide, based upon evidence and not upon speculation, guess or conjecture. The amount of money to be awarded for certain of these elements of damage, such as mental anguish, cannot be proved in a precise dollar amount. The law leaves such amount to your sound judgment.

Denial of or delay in granting credit does not constitute damage in and of itself under the law.

Damages for embarrassment, humiliation and mental anguish will not be presumed to have occurred, plaintiff must prove they have occurred.

Although the court in *Shuman* allowed mental distress as a recoverable element of "actual damages," the court held that such damages will not be presumed—plaintiff must prove them.[41] Significantly, the court stated that "it would be inconsistent with the congressional purpose of eliminating invidious discrimination to ignore the emotional harm often flowing from it by limiting the aggrieved applicant to out-of-pocket losses." *Id.* at 1154. Similarly, it would be totally inconsistent with the congressional purpose of protecting the right to privacy guaranteed by the Constitution if this Court ignored the primary damage resulting from a Privacy Act violation by limiting recovery to out-of-pocket losses. The statements of congressional purpose in the Act's legislative history belie the out-of-pocket interpretation.[42]

487 F.Supp. at 1239 n. 7.

**40.** The Court in *Cherry v. Amoco Oil Co.*, 490 F.Supp. 1026, 1029 (N.D.Ga.1980) implicitly accepted humiliation as a compensable element of "actual damages" when it stated that plaintiff's testimony that she was humiliated and felt damaged by defendant's failure to grant her credit did not constitute "proof" of actual damage. Evidently, the court was referring to the proper legal standard for proof of mental distress. The court rejected plaintiff's own testimony as sufficient to establish humiliation or mental distress. (The issue before the court was whether a plaintiff must show "actual damages" in order to be entitled to any relief under the Act.)

**41.** The court determined that plaintiff had raised a genuine issue regarding her emotional harm by deposition testimony that she was "infuriated," "angry," "upset," and "felt an injustice had been done." 453 F.Supp. at 1154.

**42.** This Court is not unaware that, subsequent to the enactment of the Act in issue here, the term "actual damages" in some pre-1974 statutes has been interpreted to mean "economic" loss. But the Court notes that this interpretation has been given to the term in statutory provisions which are not at all analogous to the statute at issue. *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460 (9th Cir.1977) (interpreting "actual damages" in 15 U.S.C. § 78bb of the Securities Acts to mean some form of economic loss); *but see Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761 (3d Cir.1976) (interpreting "actual damages" in 15 U.S.C. § 78bb to be in opposition to "punitive" damages and therefore

### III. *Conclusion*

An examination of the purposes of the Privacy Act, its legislative history, and other statutory uses of the term "actual damages" leads this Court to conclude that Johnson is entitled to compensation under the Act for his proven mental and physical injuries. We therefore reverse and remand to the district court for a determination of the amount of "actual damages" to be awarded to plaintiff.

REVERSED AND REMANDED.

not to limit recovery to out-of-pocket loss); *Duval v. Midwest Auto City, Inc.,* 425 F.Supp. 1381 (D.Neb.1977) [interpreting "actual damages" (15 U.S.C. § 1989) in federal law prohibiting tampering with odometers on motor vehicles], *aff'd,* 578 F.2d 721 (8th Cir.1978); *McCoy v. Salem Mortgage Co.,* 74 F.R.D. 8 (E.D.Mich. 1976) [interpreting "actual damages" (15 U.S.C. § 1640) for a disclosure statement violation of the Truth In Lending Act, requiring a showing that plaintiff could have gotten credit on better terms but for the breach].