**Stanmore Cawthon COOPER, Plaintiff,**

v.

**FEDERAL AVIATION ADMINISTRA-TION, Social Security Administration and United States Department of Transportation, Defendants.**

No. C 07–1383 VRW.

United States District Court, N.D. California.

Aug. 22, 2008.

James M. Wood, Reed Smith LLP, Oakland, CA, Tiffany Renee Thomas, Reed Smith LLP, San Francisco, CA, for Plaintiff.

Jennifer S. Wang, Michael Thomas Pyle, United States Attorney's Office, San Francisco, CA, for Defendants.

## ORDER

VAUGHN R. WALKER, Chief Judge.

A good many laudable public policies collide in the facts at bar. These include policies to ensure the safety of the nation's airways, to root out waste, fraud and abuse in the Social Security system and to secure personal privacy of citizens with a leitmotif of policies against discrimination. None of these policies decides this case. Rather, the court is constrained to apply the express language of the statute under which plaintiff proceeds as interpreted by the Supreme Court.

Stanmore Cawthon Cooper alleges violations of the Privacy Act, 5 USC § 552a, in an amended complaint filed on July 10, 2007. Doc. # 26. On April 28, 2008, Cooper moved for partial summary judgment on liability, Doc. # 66, and on May 1, 2008, defendants Federal Aviation Administration ("FAA"), Social Security Administration ("FAA") and United States Department of Transportation ("DOT") moved for summary judgment contending that they had no liability to Cooper. Doc. # 100. For the reasons discussed below, the court agrees with the defendants that Cooper's motion for partial summary judgment must be DENIED, and their motion for summary judgment is GRANTED.

## I

The following facts are not disputed. To operate an aircraft legally, an individual needs a valid airman medical certificate in addition to a pilot certificate. See 14 CFR § 61.3. To obtain a medical airman certificate, an individual must complete FAA Form 8500-8, "Application for an Airman Medical Certificate." Doc. # 106 at 3, Griswold Decl. at ¶ 6.

Cooper first obtained a pilot's license in 1964. Doc. # 101-2 at 7, Wang Decl., Ex. 1, Cooper Dep. at 25:2-4. In 1985, Cooper learned that he was HIV-positive. Doc. # 101-2 at 3, Wang Decl., Ex. 1, Cooper Dep. at 19:22-23. Even before that, around 1981, Cooper stopped renewing his medical certificate, because he suspected he might be HIV-positive. Doc. # 101-2 at 8-9, Wang Decl., Ex. 1, Cooper Dep. at 30:3-31:13.

Cooper began receiving SSA disability benefits in 1996 due to severe symptoms of HIV infection. Doc. # 101-2 at 4-5, Wang Decl., Ex. 1, Cooper Dep. at 20:8-20, 22:8-22. A copy of Cooper's January 30, 1996 application for disability benefits appears in the record at Doc. # 114-2 at 2-9, Wood Opp. Decl., Ex. 1. Within several months, Cooper's health improved and he discontinued his disability benefits. Doc. # 101-2 at 6, Wang Decl., Ex. 1, Cooper Dep. at 23:6-22.

In 1998, Cooper applied for and obtained a new airman medical certificate, but did so without disclosing his HIV status on the application. Doc. # 91 at 4-5, Cooper Decl. at ¶ 12. Cooper applied to renew his medical certificate in 2000, 2002 and 2004, again omitting from the applications his HIV status and required information about medications he was taking. Doc. # 101-2 at 11-12, Wang Decl., Ex. 1, Cooper Dep. at 33:24-34:12. Copies of the 8500-8 forms for these years appear in the record at Doc. # 101-5 at 2-17, Wang Decl., Ex. 16.

On August 6, 2002, the DOT Office of Inspector General ("DOT-OIG") proposed a joint investigation, known as Operation Safe Pilot ("OSP"), to the SSA Office of Inspector General ("SSA-OIG"). See Doc. # 102-2 at 2, Stickley Decl., Ex. 1 at SSAIG00021(memorandum proposing

OSP). The idea for the investigation came from a 2002 joint investigation of a pilot who had used different doctors to certify medical fitness to fly and to obtain disability benefits. That investigation raised safety concerns within the DOT–OIG that such deception could allow medically unfit pilots to evade detection and endanger the public. Doc. # 103 at 2, Jackson Decl. at ¶ 4.

According to the proposal, the investigation would involve cross-referencing active pilots' social security numbers against databases of SSA disability income and supplemental security income beneficiaries. Doc. # 102–2 at 2, Stickley Decl., Ex. 1 at SSAIG00021. The comparison of data between the agencies was intended to uncover various types of fraud against both agencies:

- Pilots that have submitted false or fraudulent SSNs to the FAA in order to gain a pilot's license.

- Pilots that have altered their name in order to obtain a pilot's license.

- Pilots that are claiming a debilitating condition with the SSA and claim good health to obtain a FAA medical certificate.

- Pilots that have criminal histories which prohibit them from maintaining a pilot's license.

- Pilots that have stolen someone's identity "identity theft" [sic].

- Possible drug smuggling, or pilots that are conducting illegal activity.

Doc. # 102–2 at 2, Stickley Decl., Ex. 1 at SSAIG00021 (emphasis added).

Although initially proposed as a nationwide project, it was approved by DOT–OIG and SSA–OIG as a regional project, limited to northern California. Doc. # 103 at 2, Jackson Decl. at ¶ 5; Doc. # 102 at 2, Stickley Decl. at ¶ 4.

Both DOT–OIG and SSA–OIG considered Privacy Act implications of OSP to some degree. Hank Smedley, DOT–OIG Special Agent in Charge for the region that includes northern California, Doc. # 103 at 2, Jackson Decl. at ¶ 2, discussed the Privacy Act with his colleagues and reviewed the Privacy Act and DOT routine use exceptions to the Privacy Act that DOT argues permitted disclosures of information during OSP. Doc. # 101–3 at 32–37, Wang Decl., Ex. 6, Smedley Dep. at 52:24–53:25, 55:20–56:13, 59:23–60:13. Similarly, SSA–OIG created a set of guidelines for the investigation that it believed would insure the investigation "does not run afoul of the Privacy Act." Doc. # 102–2 at 8, Stickley Decl., Ex. 2; see also Doc. # 102 at 2, Stickley Decl. at ¶ 5. The SSA–OIG recommended that:

(1) the run be conducted in house;

(2) that we're dealing with DOT–OIG (as opposed to the FAA) and as such are comfortable with their "enforcement" powers;

(3) with respect to SSN misuse, we share information with DOT–OIG only once we open a case, and we have an AUSA considering SSN charges;

(4) with respect to disability fraud, we only share information with DOT–OIG once we've got a basis for˙ opening a case, *and* we've got an AUSA willing to consider SSA charges'; and

(5) we're not using tax return information in the process.

Doc. # 102–2 at 8, Stickley Decl., Ex. 2.

On or about July 22, 2005, DOT–OIG Special Agent Stephen Jackson requested the names, dates of birth, social security numbers and other identifying information about active certified pilots from the FAA. Doc. # 105 at 2, Smith Decl. at ¶ 4; Doc. # 103 at 3, Jackson Decl. at ¶ 7. The FAA produced a CD containing the requested information and sent it to DOT–OIG Agent

Jackson. Doc. # 105 at 2, Smith Decl. at ¶ 4.

With the approval of DOT–OIG Special Agent in Charge Smedley, DOT–OIG Agent Jackson sent the names, social security numbers, dates of birth and gender of approximately 45,000 pilots in northern California to SSA–OIG Special Agent Sandra Johnson on or about November 21, 2003. Doc. # 103 at 3, Jackson Decl. at ¶ 8. This data was then compared against SSA–OIG records by SSA–OIG employee Paul Schmidt. Doc. # 101–3 at 44–48, Wang Decl., Ex. 7, Johnson Dep. at 87:23–91:23.

Around March or April 2004, SSA–OIG Agent Johnson provided DOT–OIG Agent Jackson with three spreadsheets representing SSA–OIG's comparison of the pilot data provided to it by DOT–OIG with the SSA–OIG's records: one spreadsheet compared name and social security number information, another listed active pilots who had received Title II benefits and a third listed active pilots who had received Title XVI benefits. Doc. # 103 at 3, Jackson Decl. at ¶ 9.

Around May 2004—after providing the results of the data analysis to DOT–OIG— SSA–OIG Agent Johnson opened an investigative file for OSP, assigned the case to SSA–OIG Agent Robb Stickley and ceased work on the investigation. Doc. # 101–3 at 17–19, Wang Decl., Ex. 5, Lasher Dep. at 88:21–89:12, 90:9–19; Doc. # 101–3 at 41, 53, Wang Decl., Ex. 7, Johnson Dep. at 21:19–24, 138:8–17; Doc. # 102 at 2, Stickley Decl. at ¶ 3.

SSA–OIG Agent Stickley and DOT–OIG Agent Jackson separately examined the spreadsheets for entries that suggested fraud. Doc. # 102 at 3–4, Stickley Decl. at ¶ 10; Doc. # 103 at 4, Jackson Decl. at ¶ 12. They created individual lists of individuals that they believed merited further investigation. Doc. # 102 at 4, Stickley Decl. at ¶ 11; Doc. # 103 at 4, Jackson Decl. at ¶ 12. Cooper was flagged on SSA–OIG Agent Stickley's list because he was a pilot who had received Title II disability benefits but had certified his fitness to fly. Doc. # 102 at 3–4, Stickley Decl. at ¶¶ 10–11.

Around October 2004, SSA–OIG Agent Stickley requested Cooper's disability file from the SSA. Doc. # 102 at 4, Stickley Decl. at ¶ 12. Around October 26, 2004, after a meeting with SSA–OIG Agent Stickley in which the agents concluded that Cooper merited further investigation, DOT–OIG Agent Jackson requested from the FAA a certified or "blue ribbon" copy of Cooper's medical file. Doc. # 103 at 4, Jackson Decl. at ¶¶ 12–13. SSA–OIG Agent Stickley and DOT–OIG Agent Jackson reviewed Cooper's FFA and SSA records together and discovered that Cooper did not reveal his HIV infection on his FAA medical certificate applications. Doc. # 103 at 4, Stickley Decl. at ¶ 13.

DOT–OIG Agent Jackson and SSA–OIG Agent Stickley met with FAA flight surgeons in January 2005 to determine whether Cooper and others had falsified their FAA medical certificate applications and, if so, whether the falsifications were material to the certification decision. Doc. # 103 at 5, Jackson Decl. at ¶¶ 14, 16. Dr. Goodman, an FAA flight surgeon, reviewed Cooper's FAA and SSA records and concluded that had the FAA known of Cooper's preexisting HIV infection when he applied for his airman medical certificates in 2000, 2002 and 2004, the FAA would not have issued Cooper's unrestricted medical certificates. Doc. # 103 at 5, Jackson Decl. at ¶¶ 16–17.

On or about March 22, 2005, the FAA issued an emergency order revoking Cooper's pilot certificate. Doc. # 101–4 at 26–

31, Wang Decl., Ex. 14 at FAA00173–FAA00178.

On March 23, 2005, DOT–OIG Special Agent Lisa Glazzy and DOT–OIG Agent Jackson interviewed Cooper at a Starbucks coffee shop at the airport in Hayward, California. Doc. # 103 at 6, Jackson Decl. at ¶ 19. At the interview, Cooper admitted that he had intentionally failed to report his HIV infection and medical conditions associated with his HIV infection on his FAA airman medical certificate applications in 2000, 2002 and 2004. Doc. # 103 at 6, Jackson Decl. at ¶ 19.

On August 30, 2005, Cooper was indicted on three counts of making false statements to a government agency in violation of 18 USC § 1001. See Doc. # 4 in case no 05–cr–0549–VRW–1. On March 13, 2006, judgment was entered against Cooper. See Doc. # 37 in case no 05–cr–0549–VRW–1. Cooper pleaded guilty to one count of making and delivering a false official writing, a misdemeanor under 18 USC § 1018. Doc. # 37 in case no 05–cr–0549–VRW–1 at 1. Cooper was sentenced to two years of probation, a fine of $1,000 and a special assessment of $25. Doc. # 37 in case no 05–cr–0549–VRW–1 at 2, 4.

## II

### A

"Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists." *McCarthy v. Northwest Airlines*, 56 F.3d 313, 315 (1st Cir.1995). That is, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Further, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. And the burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is granted only if the moving party is entitled to judgment as a matter of law. FRCP 56(c).

The nonmoving party may not simply rely on the pleadings, however, but must produce significant probative evidence, by affidavit or as otherwise provided in FRCP 56, supporting its claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). Summary judgment is appropriate when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex* at 322, 106 S.Ct. 2548. The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

### B

The Privacy Act, 5 USC § 552a, provides in relevant part that:

(b) No agency shall disclose any record which is contained in a system of rec-

ords by any means of communication to any other person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be—

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section; * * *.

5 USC § 552a(b)(3).

"Routine use" means "the use of * * * a [disclosed] record for a purpose which is compatible with the purpose for which it was collected." 5 USC § 552a(a)(7). The statute requires that "each routine use of the records contained in the system, including the categories of users and the purpose of such use" be published in the Federal Register at least annually as part of "a notice of the existence and character of the system of records * * *." 5 USC § 552a(e)(4)(D).

In addition, the statute requires that each agency maintaining record systems:

(3) inform each individual whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the individual—

(C) the routine uses which may be made of this information as published pursuant to paragraph (4)(D) of this subsection; * * *.

5 USC § 552a(e)(3)(C).

■ Thus, disclosure of a record from one agency to another does not satisfy the routine use exception to 5 USC § 552a(b) unless the government shows that (1) disclosure of the record is within the scope of an agency's routine use regulations as published in the Federal Register and (2) disclosure of the record is for a purpose which is compatible with the purpose for

which the record was collected. See *Covert v. Harrington,* 876 F.2d 751, 754 (9th Cir.1989). Assessing compatibility requires a "dual inquiry into the purpose for the collection of the record in the specific case and the purpose of the disclosure." *Britt v. Naval Investigative Serv.,* 886 F.2d 544, 548–9 (3d Cir.1989).

■ The government must also comply with the independent requirement of 5 USC § 552a(e)(3)(C) that an agency collecting information shall inform individuals who supply information on the form used to collect the information or on a separate form that can be retained by the individual of the routine uses that may be made of the information. *Covert,* 876 F.2d at 755.

A civil cause of action for violations of 5 USC § 552a(b) is created by 5 USC § 552a(g)(1)(D). See *Doe v. Chao,* 540 U.S. 614, 618, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004). That provision states:

Whenever any agency

* * *

(D) fails to comply with any other provision of this section, or any rule promulgated thereunder, *in such a way as to have an adverse effect on an individual,* the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 USC § 552a(g)(1)(D) (emphasis added).

The statute further provides that:

In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—

(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person

entitled to recovery receive less than the sum of $1,000; and

(B) the costs of the action together with reasonable attorney fees as determined by the court.

5 USC § 552a(g)(4).

The Supreme Court has held that *actual damages* are a required element of claims, like Cooper's, that are brought pursuant to 5 USC § 552a(g)(1)(D). *Chao*, 540 U.S. at 617–18, 124 S.Ct. 1204. The Court did not, however, reach the issue whether non-pecuniary harm, such as emotional distress, qualifies as *actual damages*. *Chao*, 540 U.S. at 622 n. 5, 124 S.Ct. 1204.

■ Thus, to prove his claim, Cooper must establish that the disclosures were illegal under 5 USC § 552a(b), that the illegal disclosure was intentional or willful and that he suffered an adverse effect and actual damages as a result of the disclosures. Although the court's decision turns on Cooper's failure to raise an issue of actual damages as it appears the Supreme Court interprets that term in the context of section 552a(b), the court will review the other liability factors in the event of an appeal and the appellate court's interpretation of section 552a(b) contrary to that of this court.

### III

Cooper argues that the undisputed facts satisfy the elements of a Privacy Act claim under 5 USC § 552a(g)(1)(D); defendants argue that none has been satisfied.

### A

As the recital of the facts above indicates, the government does not dispute that records pertaining to Cooper were transferred between agencies without the prior written consent of Cooper. Accordingly, under the plain language of 5 USC § 552a(b), the disclosures were illegal un-

less they fell within one of the exceptions enumerated within § 552a(b).

In its motion for summary judgment, the government devotes time to defending the intra-agency sharing of records between the FAA and DOT–OIG and the disclosure occasioned by the FAA's emergency revocation order. Doc. # 100 at 18–20. Cooper argues, and the court agrees, that these inquiries "miss the core Privacy Act issue in this case," Doc. # 113 at 4:

> That core issue is straightforward: may the [SSA], after collecting private information for ostensible purposes that have nothing to do with verifying one's capacity to fly, offer those records wholesale to a [DOT] agent, without even receiving a written request from the Head of the DOT for the records. Likewise, may the DOT, after collecting private information for ostensible purposes that have nothing to do with verifying one's eligibility for disability benefits, provide those records wholesale to a SSA agent without receiving a written request for the records from the Head of SSA?

Doc. # 113 at 4.

The central issues are whether the DOT–OIG and the SSA–OIG violated the Privacy Act when they shared records with each other. The government asserts that the transfers between the agencies were permissible under the "routine use" exception to the Privacy Act. Doc. # 100 at 21–24.

#### 1

· ■ The court turns first to DOT–OIG's disclosure of the name, social security number, date of birth and gender of Cooper to SSA–OIG Special Agent Sandra Johnson on or about November 21, 2003. The forms on which this information was submitted by Cooper to the FAA appear in the record at Doc. # 101–5 at 2–17, Ex. 16.

Cooper argues that the notice provided was inadequate, Doc. # 100 at 19–22, 21 n. 82, but the evidence of notice that Cooper cites—a blank FAA Form 8710-1, see Doc. # 88, Wood Decl., Ex. 62—is not the form that Cooper actually submitted to the FAA.

The forms that Cooper actually submitted to the FAA contained a notice that states that the information provided may be used "to comply with the Prefatory Statement of General Routine Uses for the Department of Transportation." Doc. # 101–5 at 16, Wang Decl., Ex. 16. And it is within the Prefatory Statement of General Routine Uses for the Department of Transportation that the routine uses defendants argue are applicable are found.

Assuming without deciding that notifying Cooper of the location in the Federal Register where additional routine uses can be found satisfies the notice requirement of 5 USC § 552a(e)(3)(C), an examination of the routine uses cited by the government reveals that the DOT–OIG's use of Cooper's records—transferring them to the SSA–OIG for analysis to discover fraud on the DOT or SSA—is not within their scope. Defendants argue that DOT–OIG's use of Cooper's records falls within general routine uses 1 and 9, see Doc. # 100 at 21–23. These routine uses are listed in the Federal Register:

1. In the event that a system of records maintained by DOT to carry out its functions *indicates a violation or potential violation of law,* whether civil, criminal or regulatory in nature, and whether arising by general statute or particular program pursuant thereto, the *relevant records in the system of records may be referred,* as a routine use, to the appropriate agency, whether Federal, State, local or foreign, charged with the responsibility of investigating or prosecuting such violation or charged with enforcing or implementing the statute, or rule, regulation, or order issued pursuant thereto.

\* \* \*

9. DOT may make available to another agency or instrumentality of any government jurisdiction, including State and local governments, *listings of names* from any system of records in DOT for use in law enforcement activities, either civil or criminal, or to expose fraudulent claims, regardless of the stated purpose for the collection of the information in the system of records. These enforcement activities are generally referred to as matching programs because two lists of names are checked for match using automated assistance. *This routine use is advisory in nature and does not offer unrestricted access to systems of records for such law enforcement and related antifraud activities.* Each request will be considered on the basis of its purpose, merits, cost effectiveness and alternatives using Instructions on reporting computer matching programs to the Office of Management and Budget, OMB, Congress and the public, published by the Director, OMB, dated September 20, 1989.

65 FR 19476, 19477–78.

DOT–OIG's use of Cooper's information does not fall into either of these routine uses. Routine use 1 allows sharing with an appropriate federal agency only when a system of DOT records "indicates a violation or potential violation of the law." When DOT–OIG sent the name, social security number, date of birth and gender of approximately 45,000 pilots to SSA–OIG, it was not because those records indicated a violation or potential violation of the law. Rather, the records were sent to *discover* violations or potential violations.

And while routine use 9 allows sharing of records for law enforcement activities

"regardless of the stated purpose for the collection of the information," it only allows the disclosure of names. DOT–OIG's sharing of social security numbers, dates of birth and gender is clearly beyond the scope of this routine use.

Because DOT–OIG transmitted Cooper's records to another agency without his prior consent and this use does not fall within the routine use or another exception to 5 USC § 552a(b), the DOT–OIG's use of Cooper's record was unlawful under 5 USC § 552a(b).

2

■ The court turns next to SSA–OIG's sharing of Cooper's social security records. That use occurred around March or April 2004, when SSA–OIG Agent Johnson provided DOT–OIG Agent Jackson comparisons of the DOT–OIG data with the SSA–OIG's records, including a spreadsheet showing that Cooper had received Title II disability payments.

Cooper first argues that the notice provided on the form he used to submit his information to SSA was insufficient. Doc. # 67 at 21–22. That form appears in the record at Doc. # 114–2 at 2–9, Wood Opp. Decl., Ex. 1. The form's Privacy Act notice indicates that the information furnished on the form may be used "to enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage." Doc. # 114–2 at 2, Wood Decl., Ex. 1 at SSA0034.

Defendants argue that this is adequate notice of their asserted routine uses, see Doc. # 100 at 18. Those uses are listed in the Federal Register:

a. Information from this system of records may be disclosed to *any other federal agency* or any foreign, state, or local government agency *responsible for enforcing, investigating, or prosecuting violations of administrative, civil, or*

*criminal law* or regulation where that information is relevant to an enforcement proceeding, investigation, or prosecution within the agency's jurisdiction. * * *

c. Information from this system of records may be disclosed to a federal, state, or local agency maintaining civil, criminal or other relevant enforcement records or other pertinent records such as current licenses, *if necessary to obtain a record relevant to an agency decision concerning the hiring or retention of an employee, the issuance of a license, grant or other benefit.* * * *

m. *Information from this system of records may be disclosed to third party contacts,* including public and private organizations, in order to obtain information relevant and necessary to the investigation of potential violations in HHS programs and operations, *or where disclosure would enable the OIG to identify violations in HHS programs or operations* or otherwise assist the OIG in pursuing on-going investigations.

55 FR 46248, 46249–50 (emphasis added).

The court agrees with defendants that SSA–OIG's use of the records is probably within the scope of each of these routine uses. The use is within the scope of routine use (a) because the records were provided to DOT–OIG, another federal agency responsible for enforcing, investigating or prosecuting violations of law and the information was relevant to an investigation within DOT–OIG's jurisdiction. The use is arguably within the scope of routine use (c) because the records were disclosed to a federal agency maintaining licenses—pilot licenses, in this case—in order to obtain a record concerning the issuance of the license. And the use was clearly within the scope of routine use (m) because the disclosure enabled SSA–OIG to identify viola-

tions in HHS programs; in the case of OSP, the disclosure enabled SSA–OIG to identify disability fraud.

SSA–OIG's use of Cooper's records, however, suffered from a different problem. It failed to satisfy the independent requirement of 5 USC § 552a(e)(3)(C) that notice be provided of "the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection." Of the routine uses the disability application form gave notice of, only one comes close to giving notice of the routine uses that could justify SSA–OIG's use of the record: the provision that the information could be used "to enable a third party or agency to assist Social Security in establishing rights to Social Security benefits and/or coverage." But this does not give notice of those routine uses—while the records were given to a third party, they were not given to a third party to assist Social Security in *establishing* rights to benefits. Cooper's rights to benefits already had been established when he received benefits for a short period beginning in 1996. This notice is not sufficient to notify Cooper that the information could be used eight years later to determine whether Cooper and others had lied to the SSA or the FAA.

Defendants argue that the notice somehow is made adequate by the fact that the disability application form notified Cooper that "anyone making a false statement or representation of a material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law." Doc. # 100 at 19; see Doc. # 114–2 at 7, Wood Opp. Decl., Ex. 1 at SSA00339. But this statement of fact does not constitute a notification of potential uses of the information and, indeed, it appears on the form five pages after the Privacy Act notice.

Defendants also argue that the notice is made adequate by the fact that the notice warns that the list of routine uses is not exhaustive. Doc. # 100 at 19 (quoting section of form which states: "These and other reasons why information about you may be used or given out are explained in the Federal Register. If you would like more information about this, any Social Security office can assist you." Doc. # 114–2 at 2, Wood Opp. Decl., Ex. 1 at SSA00334). In support of this argument, defendants cite *Stafford v. Social Security Administration*, 437 F.Supp.2d 1113, 1119 (N.D.Cal.2006) (Laporte, MJ), a case in which a magistrate judge of this court held that the "these and other reasons" provision allowed the SSA to disclose information for routine uses not explicitly mentioned on the form.

■ The court respectfully disagrees with Magistrate Judge Laporte's decision, as it is contrary to the plain language of 5 USC § 552a(e)(3)(C), which requires notice of "the routine uses which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection." This statutory provision requires notice of routine uses as they are published, not notice *that* they are published. Magistrate Judge Laporte was concerned that such a strict reading of the notice requirement would put a "impractical burden on federal agencies," but it imposes no real burden; it merely requires agencies to state routine uses on their forms broadly enough to give reasonable notice of the various routine uses contained in the Federal Register. For example, the SSA form at issue here could have given notice of all three routine uses cited by defendants if it had stated: "This information may be shared with other government agencies for general law enforcement purposes." "Under the plain terms of the statute, a collecting agency is under a duty to inform the individuals

from whom it is collecting information of the routine uses to which that information may be put. The statute gives the agency no discretion not to discharge the duty." *Covert,* 876 F.2d at 755–56.

Accordingly, the court finds that the SSA–OIG's transmission of Cooper's records to another agency without his prior consent was unlawful under 5 USC § 552a(b).

## B

Having shown that the DOT–OIG and the SSA–OIG improperly shared his information with each other, to prove his claim, Cooper also must prove that the violation of 5 USC § 552a(b) was intentional or willful.

 In the Ninth Circuit, to prove willful or intentional violation of the Privacy Act, a plaintiff must show something "'only somewhat greater than gross negligence.'" *Covert,* 876 F.2d at 756 (internal quotation omitted). This rather opaque standard raises a number of questions which presumably the court of appeals will clarify in the event of appellate proceedings herein, so the court will not linger long on this element. Suffice it to say, the fact that a government agency follows its own disclosure guidelines is not decisive, and the "real question" is "how tenable the government's legal arguments are." *Covert,* 876 F.2d at 757.

Defendants' arguments against willfulness focus on the fact that both SSA–OIG and DOT–OIG agents working on OSP state that they considered the joint investigation's Privacy Act implications. Doc. # 100 at 25.

Cooper counters that willfulness is shown by the fact that an investigation involving the sharing of a huge amount of personal information was conducted by agents without meaningful training on the Privacy Act and with little effort by either agency to ensure Privacy Act compliance. Doc. # 67 at 24–25. As evidence of the government's carelessness, Cooper notes several missteps by defendants, including the undisputed fact that SSA–OIG did not follow its own Privacy Act guideline requiring that an investigative file be opened *prior* to the sharing of information with DOT–OIG. In addition, the court notes that it is difficult to see a legitimate basis for DOT–OIG's belief that its sharing of information with SSA–OIG fell within one of its two cited routine uses when the use was so clearly beyond the scope of those routine uses.

It appears that Cooper has at least raised a triable issue whether the Privacy Act violations were willful, but at this juncture the court need not further address the issue because, as discussed below, Cooper failed to offer any evidence that the Privacy Act violations caused him actual damages, as the court understands that term is interpreted in the present context.

## C

Cooper argues that he has suffered an adverse effect and actual damages in the form of mental distress. Doc. # 67 at 27. Cooper argues that he suffered mental distress from the disclosure of his HIV status, which was covered by the press after the public announcement of his indictment. See, e g, Doc. # 91 at 8, 10–11, Cooper Decl. at ¶¶ 28, 35. Cooper offers evidence that he suffered severe emotional distress in the form of his own declaration, Doc. # 91 at 9–10, Cooper Decl. at ¶¶ 29, 33, a report from a psychiatrist who interviewed Cooper in preparation for this litigation, see Doc. # 94, and declarations from three friends who interacted with him after the disclosure. See Doc. # 95 at 2–3, Carter Decl. at ¶ 4; Doc. # 96 at 3, Hart Decl. at ¶ 9; Doc. # 98 at 2–3, 4,

Odets Decl. at ¶¶ 6, 12. Cooper did not seek professional counseling or medications to treat the emotional distress. Doc. # 91 at 10, Cooper Decl. at ¶ 34. Cooper has not offered evidence of any pecuniary damages.

### 1

■■■■■ "The adverse effect requirement of [5 USC § 552a] (g)(1)(D) is, in effect, a standing requirement." *Quinn v. Stone,* 978 F.2d at 126, 136 (3d Cir.1992) (citing *Parks v. U.S. Internal Revenue Service,* 618 F.2d 677, 682–83 (10th Cir. 1980)). Allegations of mental distress are sufficient to confer standing. *Stone,* 978 F.2d at 136 (citing *Albright v. United States,* 732 F.2d 181, 186 (D.C.Cir.1984); *Parks,* 618 F.2d at 683). In addition, to state a Privacy Act claim, Cooper must establish a causal connection between the violation and the adverse effect. *Hewitt v. Grabicki,* 794 F.2d 1373, 1379 (9th Cir. 1986).

■■■■ Defendants argue that Cooper has not satisfied the adverse effect requirement because the emotional distress may have come from his own disclosures of his HIV status to the press and from his own wrongful acts. Doc. # 100 at 26. Cooper argues, and the court agrees, that disclosure by Cooper subsequent to disclosure by defendants and distress occasioned by prosecution for his crime do not necessarily negate a causal connection between defendants' violations of the Privacy Act and Cooper's emotional distress. See Doc. # 113 at 18 ("The precise contours of what he may recover and how his actionable distress may relate to any non-actionable distress are issues that go to the quantum, and not the fact, of damage.")

### 2

■■■■ But while allegations of mental distress are sufficient to establish that Cooper meets the "adverse effect" stand-ing requirement, they are insufficient to meet the requirement of actual damages. As discussed above, the Supreme Court has held that actual damages are a required element of claims brought under 5 USC § 552a(g)(1)(D). *Chao,* 540 U.S. at 617–18, 124 S.Ct. 1204. The Court has not, however, addressed the issue whether non-pecuniary harm, such as emotional distress, qualifies as actual damages. *Chao,* 540 U.S. at 622 n. 5, 124 S.Ct. 1204. No circuit has addressed the issue since the Supreme Court's *Chao* decision.

The Ninth Circuit has never addressed whether "actual damages" includes non-pecuniary damages in the context of 5 USC § 552a(g)(4)(A). It has, however, addressed use of the term in other statutes, and a review of its decisions demonstrates that the term "actual damages" is facially ambiguous. For purposes of the Securities Exchange Act, 15 USC § 78bb(a), for example, the Ninth Circuit held that "[a]ctual damages mean some form of economic loss". *Ryan v. Foster & Marshall, Inc.,* 556 F.2d 460, 464 (9th Cir.1977). In the context of copyright infringement, the Ninth Circuit held that "actual damages" recoverable under 17 USC § 504(a) are limited to objectively measurable financial loss. *Mackie v. Rieser,* 296 F.3d 909, 917 (9th Cir.2002). On the other hand, the Ninth Circuit treats emotional distress and humiliation as "actual damages" for violations of the Fair Credit Reporting Act, 15 USC § 1681. *Guimond v. Trans Union Credit Information Co.,* 45 F.3d 1329, 1332–33 (9th Cir.1995).

Two circuits that have addressed the definition of actual damages in the context of the Privacy Act examined the statute's legislative history to reach different conclusions. In *Fitzpatrick v. Internal Revenue Service,* 665 F.2d 327 (11th Cir.1982), the Eleventh Circuit focused on the evolution of the Privacy Act's damages provi-

sions and noted that while early versions of the legislation included provisions for punitive damages and general damages, these damages provisions were not included in the version that became law. *Fitzpatrick*, 665 F.2d at 329–31. The court found support in the legislative history for a narrow reading of actual damages and held that " 'actual damages' as used in the Privacy Act permits recovery only for proven pecuniary losses and not for generalized mental injuries, loss of reputation, embarrassment or other non-quantifiable injuries." *Fitzpatrick*, 665 F.2d at 331. In *Johnson v. Department of Treasury, IRS*, 700 F.2d 971 (5th Cir.1983), the Fifth Circuit reached the opposite conclusion. The court noted that one of the Privacy Act's stated purposes is requiring federal agencies to "be subject to civil suit for *any damages* which occur as a result of willful or intentional" violation. *Johnson*, 700 F.2d at 974–75; see 88 Stat. 1896 § 2(b)(6). After a lengthy analysis of the legislative history, see *Johnson*, 700 F.2d at 974–83, the Fifth Circuit concluded that the plaintiff there could recover for proven mental injuries. *Johnson*, 700 F.2d at 986.

The court need not, however, conduct its own analysis of the legislative history to reach the conclusion that mental distress alone does not satisfy the Privacy Act's actual damages requirement. Defendants argue, and the court agrees, that the issue must be decided by the rule that when "analyzing whether Congress has waived the immunity of the United States, [courts] must construe waivers strictly in favor of the sovereign * * * and not enlarge the waiver beyond what the language requires." *Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986).

The Ninth Circuit applied this rule in *Siddiqui v. United States*, 359 F.3d 1200 (9th Cir.2004), to hold that a statute, 26 USC § 7341(c), that allowed damages against the government of actual damages "plus" punitive damages did not authorize punitive damages absent proof of actual damages where the statute did not state that actual damages were required for punitive damages or that punitive damages could be awarded even in the absence of actual damages. *Siddiqui*, 359 F.3d at 1204. The court held that because a damages award against the government is allowed only pursuant to an express waiver of sovereign immunity, "ambiguity whether § 7431(c) authorizes a punitive damages award absent proof of actual damages must be resolved in favor of the Government." *Siddiqui*, 359 F.3d at 1204. This rule is equally applicable here: ambiguity as to whether 5 USC § 552a(g)(4)(A)'s provision for actual damages includes mental distress without evidence of pecuniary damages must be resolved in favor of the government defendants.

Accordingly, because Cooper has presented no evidence of pecuniary damages, he has not demonstrated that a triable issue of material fact exists as to the actual damages element of his claim. Defendants are entitled to summary judgment.

### IV

As discussed above, DOT–OIG and SSA–OIG improperly shared records, including Cooper's, with each other in violation of the Privacy Act. But because the court determines that Cooper must present evidence of pecuniary damages to satisfy the actual damages element of his claim and because Cooper has presented no such evidence, the court must DENY Cooper's motion for partial summary judgment, Doc. # 66, and GRANT defendants' motion for summary judgment. Doc. # 100.

IT IS SO ORDERED.